390 So.2d 379 (1980)
In the Interest of D.A.H. and S.L.H., Minor Children, et al.
Nos. 79-122/T4-372, 79-156/T4-372A.
District Court of Appeal of Florida, Fifth District.
October 16, 1980.
Rehearing Denied November 25, 1980.
*380 Walter Komanski of Legal Aid Society of Orange County, Orlando, for appellant, mother.
Sally Dee Kest of Graham, Markel, Scott, Marlowe, Appleton & McDonough, P.A., Orlando, for appellant, father.
Douglas E. Whitney of Dept. of Health and Rehabilitative Services, Orlando, for appellee.
ORFINGER, Judge.
The final judgment appealed from terminated appellants' parental rights and granted a petition by the Department of Health and Rehabilitative Services for permanent commitment for subsequent adoption. Appellant mother is the mother of both children, born April 1, 1975 and November 25, 1976, respectively. Appellant father is the father of the younger child, D.A.H. The father of S.L.H. did not appear.
On procedural grounds, the father of D.A.H. says that the judgment is improper because he was never served with process, despite knowledge by the social worker on the case that he claimed to be the father of this child. He is not married to the mother. Any error is not giving him notice was cured, however, when he voluntarily appeared, filed an affidavit of paternity, counsel was appointed for him and the proceedings were continued so that he could properly defend the petition.
The mother asserts that the evidence is insufficient to sustain the judgment terminating her parental rights, and while we are reluctant to interfere with the conclusions of the trial judge, it would appear that he applied an incorrect standard to the evidence before him.
Section 39.11(2)(d), Florida Statutes (1977) was the law in effect at the time these proceedings were commenced and heard.[1] The statute did not attempt to *381 define "abandoned" or "neglected" as it does subsequent to the 1978 amendment,[2] but it is clear that those are among the required findings necessary to support a judgment of permanent commitment. The trial court recognized this requirement in the final judgment. He found the children to be abandoned and neglected "... as those terms are defined by F.S. section 39.11(1)(d) [(2)(d)] [sic] (1977) and F.S. section 39.01(1) and (2) [(27)] [sic] (1978)... ."
Whatever the 1978 amendment does to the requirement for findings of abandonment or neglect in permanent commitment cases, it does not apply to this case because the events which gave rise to the petition as well as the final hearing all took place before the statute became effective.
The only definition of "abandoned" prior to the 1978 amendment, as that term applies to this type of case, was found in cases dealing with adoption without parental consent, where consent was excused in the case of a natural parent who had abandoned the child.[3] Under that statute, the cases have uniformly held that abandonment consists of conduct which manifests a settled purpose to permanently forego all parental rights and the shirking of the responsibilities cast by the law of nature so as to relinquish all parental claims to the child. Solomon v. McLucas, 382 So.2d 339 (Fla.2d DCA 1980); Durden v. Henry, 343 So.2d 1361 (Fla.1st DCA 1977). Temporary failures or derelictions of parents may justify temporary deprivation of custody of their child, but will not support permanent loss of parental rights. In re Adoption of Gossett, 277 So.2d 832 (Fla.1st DCA 1973). The 1978 amendments reinforce these decisions by making it necessary for the court to find the ability to support the child and provide it with the proper environment before it can declare an abandonment or neglect, unless the court finds that the parent does not evince a settled purpose to assume all parental duties.[4] Under either statute, the court must also find that severing parental rights is manifestly in the child's best interest.
When the State undertakes to permanently deprive a natural parent of the right to rear her children, the courts should zealously protect the rights of the parent and insure that this drastic action strictly conforms to legislative guidelines. Smith v. Florida State Dept. of Health and Rehab. Services, 299 So.2d 127 (Fla.3d DCA 1974). Permanent termination of parental rights is a drastic step and it should not be ordered except upon clear and convincing proof that the natural parent has conducted herself in such a way as to show a complete abandonment of the child. In re Adoption of Noble, 349 So.2d 1215 (Fla.4th DCA 1977). While it would serve no useful purpose to restate the evidence here, it is difficult to interpret the mother's conduct as indicative of a settled purpose to permanently forego her parental rights and to shirk her parental responsibilities. She is disabled, has health and financial difficulties and lacks education. These shortcomings alone, however, do not subject her to the permanent loss of her children. Despite her medical problems *382 she did visit her older child although missing some appointments, the last such visit on the before her younger child was born. She visited her younger child after he was placed in foster care, the last such visit occurring on October 18, 1977. On March 27, 1978, the Department filed this petition, and it admits that it would not arrange for visitation after that time. Although appellant had not seen her older child for more than a year prior to the filing of the petition, she had visited her younger child within six months prior to the filing. She was not permitted visitation after the filing. The trial judge did not find the mother unfit.
This falls short of the required clear and convincing proof. Although there is evidence to support the court's finding that termination of parental rights of the mother was manifestly in the best interest of the children, this is not enough under the applicable statute which requires the existence of one of the stated statutory grounds.
We reverse the final judgment and remand the matter to the trial court for further proceedings and reconsideration in the light of this opinion. Fortunately, the trial judge recognized the need to continue the parental contact during this appeal hoping for eventual rehabilitation, so the trial judge is free to take additional testimony as he deems warranted.
REVERSED and REMANDED.
FRANK D. UPCHURCH, Jr., J., concurs.
COBB, J., dissents with opinion.
COBB, Judge, dissenting.
In my view there was clear and convincing evidence before the trial court to support his factual determination that the best interests of the children herein concerned require their permanent commitment for adoption. The requisite statutory findings are recited and the evidentiary facts show:
In the years preceding the birth of her children, Mary led an eventful and unsettled life. She had a short temper and at age sixteen she got into a fight and almost killed a girl. Later that same year, she ran away from home. She lived with the Hell's Angels. At age seventeen she had a miscarriage and attempted suicide. When she turned eighteen, she married. A year later her husband deserted her and she gave birth to her first child, S.L.H., on April 1, 1975 in Orlando. At this time, she was unemployed and was living with her grandmother. A short time later, she moved in with neighbors of her grandmother for free room and board in exchange for doing housework and caring for the neighbor's child, along with S.L.H.
It was about this time that Mary attempted to give S.L.H. away at a shopping center. As a result, H.R.S. contacted her and tried to put her on a rehabilitation plan. The H.R.S. counsellors attempted to get Mary to participate in mental health counselling, to participate in vocational rehabilitation through the Bureau of Blind Services, and to attend parent education classes on child care. Mary refused to participate in any of the programs suggested by H.R.S. She voluntarily placed S.L.H. in foster care on March 5, 1976 and moved to Lakeland were she lived with her boyfriend's relatives and was employed as a babysitter. After a few months, she and her boyfriend moved back to Orlando. Mary last visited S.L.H. on November 24, 1976.
The following day, on November 25, 1976, D.A.H. was born. While pregnant with D.A.H., Mary had been hospitalized for nerves. She had also been warned by H.R.S. workers that if she was not able to assume responsibility for S.L.H. within three months after D.A.H.'s birth, then H.R.S. would move for permanent commitment. However, Mary continued to refuse to embark upon any program of rehabilitation other than to become employed as a topless go-go dancer, where she worked from 7:00 P.M. until 2.00 A.M. six days a week. Her live-in boyfriend was unemployed.
On June 7, 1977, Mary left D.A.H. with a babysitter who took one of her own children to the hospital and left D.A.H. unattended *383 with two other children. As a result, D.A.H. was picked up by H.R.S. and returned to Mary. Mary subsequently stipulated to having D.A.H. placed with H.R.S. The caseworker set up two appointments for Mary to see D.A.H., which she failed to keep. A third appointment was scheduled for July 14, 1977. On that date, the caseworker drove to Mary's home, woke her up, and transported her to the H.R.S. center so that Mary could see D.A.H. Mary then failed to keep appointments to see D.A.H. on August 1, August 10, and on August 17, 1977, even though a caseworker went to her house to pick her up for the August 17 appointment. The caseworker visited Mary in her house on August 20 and October 10, 1977 and set up another visitation of D.A.H. for October 18, 1977. Mary appeared at that visitation with her boyfriend. However, although the appointment was scheduled for one hour in length, they ran out after about fifteen minutes because D.A.H. was crying and did not recognize the boyfriend. H.R.S. did not schedule any more appointments.
During the time that S.L.H. and D.A.H. had been in H.R.S.'s custody, Mary had made only $5.00 contribution to H.R.S. for their support. She had done nothing for them on their birthdays or on Hanukkah.
The last time that the caseworker visited Mary's home, it was untidy. There was a garbage bag on the front porch. There was the smell of decaying food inside the home. Dirty dishes and pots and pans littered the kitchen. There was a strong smell of urine in the bedroom that would have been the children's bedroom, and that day the house looked better than any other time that the caseworker had visited it. At other times, there had been garbage and broken bottles lying around.
Russell, the boyfriend who lived with Mary, had been unemployed for at least two years. He had initially denied paternity of D.A.H. However, after the petition for permanent custody was filed, he then admitted paternity.
Mary had indicated that she wanted the children back and that she loved them. When she had them, she clothed them with clothes given to her by H.R.S. and she fed them. It was never alleged that she abused them. However, she failed to devise any plan to emotionally or financially care for the children other than to look into the possibility of their being kept by a 24-hour babysitting service during the time that she worked.
An occasional visit does not negate "neglect," as I understand that term. Nor should it, in my view, preclude a finding that this mother has shirked her parental responsibilities cast by the law of nature so as to relinquish her parental claims. The test is not what this court would do if initially passing upon the evidence, but whether or not there is sufficient evidence in the record to support the trial court's determination. Morrison v. Smith, 257 So.2d 623 (Fla.2d DCA 1977). I would affirm.
NOTES
[1] § 39.11(2), Fla. Stat. (1977):

When any child shall be adjudicated by a court to be a dependent child, the court having jurisdiction of the child shall have the power, by order, to:
* * * * * *
(d) Permanently commit the child to the division of family services or a licensed child-placing agency willing to receive the child for subsequent adoption if the court finds that the child has been abandoned by the natural parent or parents, and legal guardian, if any, of the child; or that the parent or parents, and legal guardian, if any, have substantially and continuously or repeatedly refused, or though financially able have neglected, to give the child parental care and protection; or that the parent or parents, and legal guardian, if any, are unfit by reason of their conduct or condition which is seriously detrimental to the child's welfare; or if the parent or parents have voluntarily executed a written surrender of the child for subsequent adoption in the form required by paragraph (c) of subsection (7); and if the court finds that it is manifestly to the best interest of the child to do so.
[2] § 39.01(1) and (27), Fla. Stat. (Supp. 1978).
[3] § 63.072, Fla. Stat. (1977).
[4] In the Interest of P.S., R.S., and R.S. v. State, No. 79-423/T4422 (Fla.5th DCA, April 23, 1980).