413 So.2d 418 (1982)
In the Interest of [C.M.H.], a Child.
No. AE-88.
District Court of Appeal of Florida, First District.
April 15, 1982.
*419 David R. Fletcher of Fletcher & Fletcher, Jacksonville, for appellant.
Jeffrey B. Morris, Jacksonville, for appellee.
MILLS, Judge.
Carolyn Henry contends the trial court erred in entering a final order terminating her parental rights and permanently committing her daughter to the custody of the Department of Health and Rehabilitative Services (HRS) for subsequent adoption. We disagree and affirm.
The trial court's final judgment is so well reasoned and written that we adopt it as the opinion of this Court. The pertinent parts of the final judgment are as follows:
This case is before the Court on the sworn petition of HRS praying that the above child be permanently committed to HRS for subsequent adoption. The petition alleges that the child was adjudicated a dependent child in Clay County, Florida, Juvenile Case No. 76-26-CJA. The petition further alleges that the natural mother, Carolyn Elean Shivler Henry, has neglected the minor child within the meaning of Florida Statutes Chapter 39.
Father of child duly executed a surrender, consent and waiver of notice form.
Mother of child contests the petition through her court-appointed attorney.
The Court has taken judicial notice of Case No. 76-26-CJA, Clay County, Florida, under Section 90.202(6), F.S. Such records reflect:
(a) A sworn petition of dependency filed on 2/23/76, alleging "said child's parents are unable to provide a stable home environment at this time" (Exhibit 3 in evidence). Section 39.01(10), F.S., 1975, defines a "dependent child" under subsection (c) as one who "has not proper parental support, maintenance, care or guardianship" and under subsection (e) as one who "is living in a condition or environment such as to injure him or endanger his welfare".
(b) On March 4, 1976, an order was entered by Circuit Court Judge Clifford B. Shepard reciting that the parents were personally *420 before the Court, and "that said children [C.M.H. and S.H.] are dependent because the allegations of the Petition were substantiated." It was further ordered that the children "be awarded to the Office of Social and Economic Services" (Exhibit # 3 in evidence).
(c) A Supplemental Petition for Review was filed by HRS on 12/29/77. A motion for continuance was filed on 2/21/78 by Christina Zawisza, Jacksonville Legal Aid, on behalf of the mother. The motion requested a home study of mother's current residence in Beaver Falls, PA. Circuit Court Judge Lamar Winegeart entered an order on 2/21/78 continuing the temporary care, custody and control of child in Office of Social and Economic Services.
(d) A Supplemental Petition for Review was filed by HRS on 1/9/80, and a notice of hearing was set. A copy was mailed to Ms. Carolyn Henry, mother, at 426 Park Street, Rochester, Pennsylvania and to Mr. Richard Jacobs, Esq., Beaver Falls Plaza 1008 Seventh Avenue, Beaver Falls, Pennsylvania 15010. Mr. Jacobs is an attorney for a legal aid group in Beaver Falls, PA. and at one time had conferred with Ms. Henry. A home study of mother's residence received from Beaver County Children & Youth Services, dated 11/19/79 was filed in the case. Included in the report is the following evaluation.
In completing this home evaluation, I found Mrs. Henry to be reasonably friendly and co-operative. She responded quite freely to my questions regarding her marital situation, financial status, health, and present social activities. She did, however, become quite anxious and perhaps upset when I brought up the subject of a psychological evaluation. She became very defensive and refused to even consider the possibility that such an evaluation might be beneficial to her. Mrs. Henry also became rather tense when I began to ask her about her involvement with [C.M.H.]. She said it has been over three years since she has visited with this child, but added that she has written a few letters to her in recent weeks. I asked Mrs. Henry what her reason was for not visiting with [C.M.H.] and she stated, "If they want me to come down there (meaning to Florida), they will have to make arrangements for me." I asked her what she meant by this, and she said that they would have to find a place for her to live and provide her with public assistance benefits. I then asked Mrs. Henry if she had contacted your agency to discuss this matter, and she stated that someone had called her several months ago but that she didn't really want to talk to anyone from the agency. Mrs. Henry then stated that I should call the agency in Florida and make arrangements for [C.M.H.] to come to Pennsylvania for a visit with her. She said that it was my job to do this for her. I again explained to Ms. Henry that I was there only to do a home evaluation and that any visitation arrangements or other inquiries about [C.M.H.] would be her responsibility and not mine. At this point Mrs. Henry became very angry and indicated to me that the interview was over as far as she was concerned.
In my opinion, Mrs. Henry has a very limited understanding of the concept of responsibility especially as it applies to the role of being a parent to her children. She allowed her son, [S.H.] to leave home in July of 1978 (at age 16) without even knowing what his destination would be and with full knowledge that he would not be receiving any adult supervision. Although [S.H.] is now living close by in Rochester, Pennsylvania, the situation remains relatively unchanged in regard to his care and supervision.
In regard to [C.M.H.], Mrs. Henry admits that it has been over three years since she has even seen the child. She did not, in my opinion, offer any type of valid excuse for not fulfilling her responsibilities in this regard, and even stated to me that she could manage to get to Florida if necessary. On the contrary, she seems to be blaming your agency for the fact that [C.M.H.] is still in placement.
*421 (d) On 3/5/80, Teresa J. Sopp, Jacksonville Legal Aid, filed a Notice of Appearance for mother. On 3/7/80, Circuit Court Judge Lamar Winegeart entered an order that the child ... shall be continued in the temporary care, custody and control of the Office of Social and Economic Services.
(e) On 3/12/80, there was filed a letter from HRS Counselor Charlotte Gaskins to Judge Winegeart which starts: "We are responding to your request for a written statement regarding the progress of Permanent Commitment proceedings for the above named child." It explains that the agency was in the process of making diligent search for the child's father. In each of the prior supplemental reviews, an affidavit had been filed alleging that father's residence was unknown.

CONTENTIONS
HRS contends:
(1) The finding of neglect which was the basis of the dependency adjudication in Case No. 76-26-CJA is sufficient to sustain the neglect required for permanent commitment.
(2) Notwithstanding neglect, the testimony proves "abandonment" and therefore the order of permanent commitment should be entered on this ground, if not neglect.
Mother contends:
(1) The finding of neglect in the adjudicatory hearing cannot be used in the permanent hearing because the degree of proof is different.
(2) HRS has not amended its petition to allege abandonment, and even if the Court deems such amendment not necessary, the Court cannot consider abandonment as a ground since it would be prejudicial to mother and was objected to by mother's counsel.

CENTRAL ISSUE
In order to answer the contentions of the litigants herein, it is necessary to make a determination of the nature of a permanent commitment proceeding. Is it an adjudicatory hearing or a dispositional hearing or some type of hybrid hearing?
The issue raised by mother is a perplexing one. The statute is not clear and the cases are difficult to understand since there is no case which has ruled specifically on this point.

CASES
1. In a recent case of Interest of D.A.H. and S.L.H., 390 So.2d 379, (Fla. 5th DCA 1980), wherein a permanent commitment order was reversed, the appellate court stated that "it is clear that those (abandonment or neglect) are among the required findings necessary to support a judgment of permanent commitment". The appellate court found that "although there is evidence to support the court's finding that termination of parental rights of the mother was manifestly in the best interest of the children, this is not enough under the applicable statute which requires the existence of one of the stated statutory grounds". The appellate court found evidence as to "abandonment" was not proven by the required "clear and convincing proof".
The dissenting opinion indicates that the trial court considered testimony which involved facts which predated placement of the child voluntarily in foster care. A voluntary placement in foster care does not require an adjudication of dependency. Therefore, in this case, it was necessary for HRS to prove the abandonment as one of the essential elements of permanent commitment. The appellate court stated that this element must be proven by "clear and convincing evidence".
Comment: In the situation of a voluntary placement, where there has been no prior court adjudication of dependency, the hearing for permanent commitment must take on aspects of adjudication and dependency because the powers of disposition in Section 39.41(1) are available only "when any child is adjudicated by a court to be dependent "
2. In the Interest of J.F., 384 So.2d 713 (Fla. 3d DCA 1980), the trial court's granting *422 of an order of permanent commitment was affirmed by the appellate court. Although the bulk of the opinion is devoted to a discussion of "abandonment" (as are many of the opinions written on permanent commitment orders), this case did involve an order of temporary custody awarding the child to HRS. On 11/2/76 the child was voluntarily relinquished to HRS by mother for temporary assistance and foster care. On 1/5/77, HRS petitioned the Court for temporary custody which was granted by order entered 1/14/77, based upon a waiver, consent and joinder executed by the mother.
The opinion states "the findings of the trial court that abandonment occurred under Section 39.41(1)(d) and 39.01(1) or 39.11(1)(d) are supported by clear and convincing evidence." Citing Estate of C.K.G., 365 So.2d 424 (Fla. 2d DCA 1978).
Comment: There must have been an adjudication at time of temporary custody order. Fact that it was based on consent does not make it less of an adjudication. Trial judge in this case must have held another adjudicatory hearing as to abandonment. Why?
3. In the Interest of C.K.G., 365 So.2d 424, (Fla. 2d DCA 1978), an order of permanent commitment was reversed because the lower court resolved the conflicting evidence concerning fitness of appellant as mother and best interests of the children on basis of preponderance of evidence, when the correct standard of proof is "clear and convincing" evidence to deprive parents of offspring.
Comment: No facts recited as to basis of adjudication of dependency. Appellate court suggested that on remand court "may consider all evidence previously admitted as well as any further evidence which may be submitted on relevant events occurring since the last hearing." (emphasis added) This leads me to conclusion that appellate court considered the hearing a disposition hearing at which additional testimony could be heard by the Court. If it were an adjudication hearing, the appellate court could have determined from the evidence if the evidence met the correct standard and no additional evidence would be heard.
4. In Carlson v. HRS, 378 So.2d 868 (Fla. 2d DCA 1979) parental rights were terminated by the lower court, but reversed on appeal as to parent who was showing interest in child. The facts are:
(1) Between 1968-1972, Roland and Sharon Carlson had 3 children, Pamela, Roland Jr. and Eric, now aged 11, 9, 8.
(2) Subsequently, Sharon married Carr and had one child, Jason, now aged 5.
(3) On 1/10/77, Sharon placed Roland Jr. in voluntary custody of HRS because she was no longer financially capable of caring for him.
(4) On 4/4/77, she also voluntarily placed Pamela and Jason with HRS.
(5) The Carrs permanently separated in late 1977, after which Sharon resumed her relationship with Roland Carlson. They were not able to marry until November, 1978 following entry of the final decree dissolving Sharon's marriage to Carr on 10/30/78.
(6) Prior to Sharon's marriage to Carlson, Sharon and Carr, while cohabiting, entered into an agreement with HRS in November, 1977, which required compliance by 3/26/78.
(7) On 9/12/78 HRS petitioned for permanent commitment of all 4 children [Note  only 3 had been voluntarily placed with HRS, and no mention is made of prior petition on Eric].
(8) Carr did not appear at 11/16/78 hearing, but Roland and Sharon Carlson appeared and contested HRS petition. HRS presented evidence showing that during time Sharon was married to Carr, they failed to comply with requirements of their agreement with HRS. Carlsons presented evidence of their attempts to comply with conditions established by HRS for Sharon and Carr. They also attempted to show their present competency as parents.
The Court in reversing as to Sharon stated that the right of a parent to the custody *423 of his or her children can be severed only on a finding supported by clear and convincing evidence "that the parent has abandoned, abused or neglected the child " and "that it is manifestly to the best interest of the child  to sever parental rights".
The Court stated that the testimony presented by HRS failed to take into account the Carlsons' current situation, and that HRS should have investigated and evaluated the circumstances in the Carlson household from December 1977 until the time when HRS petitioned to sever parental rights.
The Court concluded "Since the evidence before the trial court did not include an evaluation of the current family unit of Sharon and Roland Carlson and their present competency as parents, we do not believe that it was sufficiently clear and convincing to require termination of their parental rights." (emphasis added)
The case was remanded for a new hearing on the petition for permanent commitment at which the Carlsons will be permitted to present evidence concerning the stability of their relationship and their ability to provide for the children.
Comment: There is no prior adjudicatory hearing mentioned in the opinion. The opinion emphasizes testimony as to present living situation of parents as being of utmost relevance. This leads to conclusion that the court was addressing itself to the issue of the best interest of the child when it spoke of the standard of proof. The case did not involve abandonment, abuse or neglect, but voluntary placement of child and failure of parents to abide by terms of HRS agreement.
The only reference that I can find in reported cases concerning the difference between adjudicatory and disposition hearings is in the case of Davis v. Page, 442 F. Supp. 258 (S.D.Fla., 1977), cited with approval in Interest of R.W.H., 375 So.2d 321 (Fla. 2d DCA 1979). Such reference occurs incidentally in the case which deals primarily with right to appointed counsel by parents:
"[T]he `temporary' custody which plaintiff believed would last a few weeks to enable her to find a job can potentially last for another 16 years. Subsequent proceedings are categorized as disposition hearings rather than adjudicatory hearings; while traditional rules of evidence govern adjudicatory hearings, virtually no evidentiary rules limit the receipt of evidence at disposition hearings. While the State bears the burden of proof in an adjudicatory hearing, the parent bears the burden of proof in a disposition hearing and must prove that restoration of custody is in the best interests of the child." (emphasis supplied)
Comment: It appears that this explanation of a disposition hearing would not be applicable to a permanent commitment disposition because HRS bears the burden of proof in a disposition hearing for permanent commitment.

CONCLUSION
A study of Chapter 39 leads me to the conclusion that a permanent commitment hearing must be considered as a dispositional hearing because:
(1) Permanent commitment is included in Section 39.41, F.S. "Powers of Disposition". Therefore, it is another form of disposition and is not an adjudication.
(2) Section 39.40(2), F.S., states that when the Court obtains jurisdiction of any child found to be dependent, the Court shall retain jurisdiction, unless relinquished by its order until the child reaches 18 years of age.
This is repeated in Section 39.41(1)(d) F.S., which covers commitment to the temporary legal custody of HRS. The statute states: "The term of said commitment shall continue until terminated by the Court or until the child reaches the age of 18."
These two provisions inform me that once adjudicated a dependent, the child remains adjudicated dependent until age 18 or unless the case is dismissed by the Court. Thus, the initial adjudication of neglect satisfies the first criteria of permanent commitment and it is not necessary to again *424 prove that the child was abandoned, neglected or abused.
(3) One of the fundamental rules of construction is that the legislative intent must be ascertained and effectuated. The Courts will not ascribe to the legislature an intent to create absurd or harsh consequences, and so an interpretation avoiding absurdity is always preferred. (City of St. Petersburg v. Siebold, et al., Florida Supreme Court, 1950, 48 So.2d 291).
Section 39.41(1)(f)1a requires that the "Court finds that the parent has abandoned, abused or neglected the child" as one of the criteria for permanent commitment.
Since the statute specifically mentions "neglect" and "abuse", how would it be possible for a parent to be guilty of either of these criteria if the child were removed from the home? Obviously, it would be impossible. Therefore, the only way in which "neglect" or "abuse" could form the criteria is if HRS were to commence a permanent commitment initially. Such action by HRS would be contrary to the aim of the Legislature in attempting to preserve the integrity of the family. As suggested in the opinion in the case of Interest of J.F., supra, in another context "  such a proposition would have a chilling effect on the Department and dissuade it from ever extending grace to parents to afford them an opportunity to become rehabilitated. The delicate inter-relationship between a parent and a child shall be fostered and encouraged by the Department."
Testimony concerning abandonment is discussed in the cases generally involves the actions of the parent that relate to the issue of whether the permanent commitment is manifestly for the best interest of the child because it is the evidence whereby a trial judge can measure the validity of the current claim of parent to retain child by the parent's actions since the child has been separated from the parent.
If a child has never been adjudicated a dependent, such as when voluntary placement was involved, then the hearing for permanent commitment must become both a dispositional hearing and an adjudicatory hearing because the Court can't dispose of a case unless there is a child who is adjudicated dependent.
This is not the situation before the Court.
(4) Finally, the conclusion that a permanent commitment is a dispositional hearing, is reinforced by the doctrine of "res judicata."
This doctrine is explained in 19 Fla.Jur. Section 104, as a rule adopted by the Court for expediency, justice and public tranquility. Public policy and the interests of litigants all require that there be an end to litigation, which, without the doctrine, would be endless. Therefore, once the Court determined in 1976 that the child was dependent by reason of neglect, such dependency became res judicata during all further proceedings. For example, in the two review hearings held since the adjudication, the fact of dependency by reason of neglect was not an issue.

STANDARD OF PROOF
The statutory criteria for a permanent commitment order has one additional feature, other than the adjudication of dependency, and that is the requirement of 39.41(1)(f)1, namely: "If the Court finds that it is manifestly to the best interest of the child to do so." What standard of proof does this require?
The statutory language of Section 39.408(1)(b):
"In a hearing on a petition in which it is alleged that the child is a dependent a preponderance of evidence will be required to establish the state of dependency." (emphasis supplied)
is not applicable to the permanent commitment hearing because that hearing is not one to determine dependency.
There is no statutory language in Chapter 39 which mentions the amount of proof required in any dispositional hearing. Therefore, case law supplies the answer. The logical conclusion to be reached by a review of the cases heretofore cited is that the standard of proof to permanently sever *425 the parental relationship is "clear and convincing" evidence. Therefore, the Court in making a determination as to whether the order of permanent commitment is "manifestly to the best interest of the child" hears testimony as to the post adjudication actions of the parent, including current actions and the current living situation of the parent. The Court must determine from all the testimony by a clear and convincing evidence that severance of the parental ties to the child is manifestly for the best interest of the child. The parent is protected by the requirement of a higher standard of "clear and convincing" evidence to have the child permanently committed. To have the child adjudicated a dependent in a proceeding which only involved temporary custody, the statutory lesser standard of "preponderance of evidence" is used.
To summarize, in the instant case when HRS filed a dependency petition in 1976 it was solely for the purpose of having the child adjudicated a dependent, and only temporary care, custody and control of the child was considered by the Court. There is no evidence that permanent commitment was urged by HRS or considered by the Court at the time of the initial dependency hearing. Therefore, proof of the allegations of dependency based upon neglect in accordance with the statutory definition then in effect required only a preponderance of the evidence. Once the child was legally adjudicated a dependent, the issue of dependency was laid to rest, and it is not necessary for HRS to reprove the allegations of neglect in review hearings or in a permanent commitment hearing.
At the hearing before the Court for a permanent commitment, having proved the adjudication of dependency by reason of neglect, HRS has the additional burden of proving by clear and convincing evidence that the permanent commitment is manifestly to the best interest of the child.
To make such determination, a review of the testimony is pertinent.

TESTIMONY
There were two hearings. At the first hearing, held on 11/17/80, the Court heard from Charlotte Gaskins, HRS Counselor; the child, [C.M.H.]; and Judy Whitter, HRS Counselor, and considered exhibits on behalf of HRS. The mother presented testimony from Christina Zawisza, Legal Aid attorney, who represented mother in prior hearings.
Following the initial hearing, the Court received a telephone call from [S.P.H.], brother of [C.M.H.]. The Court held a second hearing on 12/15/80 at which the brother testified as the Court's witness.
From the testimony and exhibits introduced into evidence, the Court makes the following findings of fact:
1. The child, ... on March 4, 1976, was adjudicated dependent by reason of neglect in Case No. 76-26-CJA, Clay County, Florida, and placed in the temporary care, custody and control of HRS. Since such adjudication, mother has never had the child in her custody.
2. Following the adjudication, mother went to Miami; that on her way back from Miami to Pennsylvania in February, 1977, she stopped in Jacksonville, Florida to consult with the HRS counselor. At that time she attempted to see the child but was unable to do so.
3. The mother has written to the child four times since the adjudication in 1976, the last time being between January and April of 1979. The mother has made four telephone calls to the child the last being around April 1979. Of the four telephone calls once she identified herself, once she had the brother call, once she said she was the aunt and once she said she was the grandmother.
4. Mother has not acknowledged the child's birthday in the last several years. Mother did not send Christmas gifts for 1976, 1977, 1978, but in 1979 she sent a scented candle.
5. In 1978 Ms. Christina Zawisza of the local Legal Aid represented mother. She wrote a letter on February 15 and on April 6 to HRS to which she received no response. On November 13, 1978 she wrote a letter to *426 HRS and she received a response from a Ms. Gionet saying that Ms. Gionet could not deal with the attorney but would have to correspond with the mother direct. During this period of time HRS had a unit on Park Street in Jacksonville which was disbanded and there was no one that Ms. Zawisza could contact concerning Ms. Henry. Ms. Zawisza testified that each letter had been written at the request of the Beaver Falls Legal Services, which had been contacted by the mother whenever she was told by Ms. Gionet generally that the mother would have to stabilize her living conditions, get better residential facilities and that a home study would be asked for.
6. Ms. Gaskins, HRS Counselor, wrote letters to mother asking her cooperation. The letter dated 5/11/79 (Exhibit # 1A) advised mother of child's interest in being adopted. Another letter was written on 8/31/79 (Exhibit # 1B). Another letter was written on 3/10/80 (Exhibit # 1C) in which it was pointed out that HRS intended to proceed with permanent commitment. This letter contained a copy of the Judicial Review Order at which Legal Aid represented mother.
7. The local Legal Aid Society appeared on behalf of the mother as late as March, 1980 at a foster care review hearing. Continuation of foster care was not contested.
8. On December 7, 1979, Ms. Gaskins, the foster care counselor, made a telephone call to the mother in which she told her that she wanted to enter into a plan which would require her to receive mental health evaluation, suitable living situation and for her to maintain contact with her daughter. The mother told her at that time that she wanted [C.M.H.] but refused to obtain the mental health evaluation. Ms. Gaskins then sent a letter which is Exhibit # 1(d) to confirm the telephone conversation and there was no response. In addition to that she sent another letter on March 10, 1980 and there was no response.
9. Ms. Whitter, HRS counselor in the permanent commitment section, stated that she spoke to the mother by telephone on April 28, 1980, at which time she told mother that she had received no contact concerning the plan. The mother told her at that time HRS had no right to take the child without her consent and that as far as she was concerned Florida should just put the child on an airplane and return the child to her.
10. Ms. Whitter testified that she recommended the permanent commitment because the mother had abandoned the child for over six months (Comment  this will be discussed later); had not formulated a contract or plan that would evince a settled purpose to have the child with her; failed to support the child in the customary manner; unwilling to cooperate, did not maintain regular contact with the child. She testified on cross-examination that she was sure the mother understood the current proceedings.
11. There was no investigation made as to any alternative placement with relatives including grandparents nor did any grandparents ever come forth to attempt to have the child placed with them.
12. There was no order for Ms. Henry to pay support for the child though Mr. Henry, the father, was ordered to pay support. Mr. Henry, the father, has signed a waiver in surrender of the child.
13. While in Pennsylvania, the mother has been receiving welfare assistance, food stamps and qualified for the medicaid program which is for people who are considered under the poverty level. She has relatives in Pennsylvania. Based upon a social study of mother prepared by Pennsylvania authorities, placement of child with her was disapproved.
14. The child is doing well in the foster home of Mr. and Mrs. Charles Jones. She has been there for four years and wants to remain there. The child goes to school regularly and makes A's and B's. She has two older brothers but is not in touch with them. She knows that one is in the Navy and does not know where the other is. (This testimony was before second hearing). The child wants to have the relationship with her mother terminated.
*427 15. The brother [S.H.], now 19 years old, last lived with his mother between March 1979 and December 1979. He received a letter from his mother several weeks prior to his appearing as a witness in which she stated she was trying hard to make arrangements to come to Jacksonville. He left his mother's home and returned to Phoenix, Arizona where he enlisted in the Navy on 4/28/80. He testified that he thought it would be in best interest of child to be reunited with mother. However, in the Court's view, he gave no valid reasons for such opinion and the Court received the impression that the family unit was not a loving, caring, closely knit unit. His purpose of returning home in 1979 was "to save" his mother because of his religious experience while he had run away, but she did not think she needed "saving". His explanation for his running away from his mother's home was a biblical quotation, something to the effect that "a person is not wanted in his own home".

CONCLUSION
1. The Court finds that the child has heretofore been adjudicated as a dependent child by reason of neglect and remains a dependent child thereby.
2. It has been proven by clear and convincing evidence and the Court finds that it is manifestly to the best interest of the child to enter the permanent commitment petitioned for because:
(a) Her mother has exhibited little, if any, interest in child.
(b) Her mother has not exhibited the stability that would be required for child to be reunited with mother. This conclusion is reached because of mother's failure to cooperate with HRS counselors concerning her medical records and to respond to their request for the entry of a plan so that she can have the child rejoin her.
(c) Child has been in the home of the foster parents for 4 years, is well adjusted, is doing well in school, is pleasant to talk to, and is entitled to the security of knowing that her future is not dependent upon an erratic mother.
(d) Child is a candidate for adoption by the foster parents so child would be part of a loving and caring family.
3. The Court further finds that it is manifestly to the best interest of the child to permanently commit her to the agency hereinafter named for subsequent adoption, said agency being authorized under the laws of the State of Florida to receive permanent commitment of said child and place said child in an adoptive home and to consent to the adoption of said child, and that said agency is willing to receive said child; that no legal custodian has been appointed by any Court for said child.

FURTHER COMMENTS
The testimony of Ms. Whitter was to the effect that the mother had abandoned the child. In exhibit # 2, page 2, she states "The natural mother, Carolyn Eleanor Shivler, has abandoned and neglected said child in that she has not cooperated with the Department of Health and Rehabilitative Services to formulate a plan that would evince a settled purpose toward return of her child to her, nor has she provided support for said child in a repetitive, customary manner."
... .
However, the definition of "abandonment" in Section 39.01 is the same in the 1979 and the 1980 statute. It reads:
"Abandoned" means a situation in which a parent who, while being able, makes no provision for the child's support and makes no effort to communicate with the child for a period of 6 months or longer. If a parent's efforts to support and communicate with the child during such a 6 month period are, in the opinion of the Court, only marginal efforts that do not evince a settled purpose to assume all parental duties, the Court may declare the child to be abandoned."
In this case, the mother is on welfare. Under the first sentence can she be said to be "while being able"?
*428 The case of Interest of D.A.H., 390 So.2d 379, (Fla. 5th DCA 1980), involved a permanent commitment on the basis of abandonment which occurred prior to the 1978 amendment to Chapter 39. However, the majority opinion includes the following dicta:
"The 1978 amendments reinforce these decisions by making it necessary for the Court to find the ability to support the child and provide it with the proper environment before it can declare an abandonment or neglect, unless the Court finds that the parent does not evince a settled purpose to assume all parental duties. Under either statute, the Court must also find that severing parental rights is manifestly in the child's best interest." (emphasis in opinion)
I understand this to mean that if the Court finds the second sentence of the definition to be applicable, then the financial ability is not a factor.
In this case, the clear and convincing evidence is that mother did abandon her child by reason of her failure to contact child within 6 months prior to the filing of the petition on July 9, 1980, and her failure to make even marginal effort to evince a settled purpose to have the child rejoin her.
For reasons previously stated, it is not necessary for the Court to find abandonment as a criteria, but there is clear and convincing evidence that the child has been abandoned by the mother, for the following reasons:
(1) There have been no visits with child (the 1976 visit was an attempt to have child run away with mother).
(2) Only 4 written communications to child, the last of which was in 1979.
(3) Only 4 telephone calls from mother, the last of which was about April 1979. The mother only spoke once, the other 3 times a brother, aunt and grandmother called.
(4) No birthday cards or presents on child's birthday.
(5) No Christmas presents for 1976, 1977 and 1978; a candle for 1979.
(6) Mother's attitude as expressed to the local HRS counselors and to the Pennsylvania social worker.
(7) At each review hearing, mother was represented by legal counsel. There is no record of any petitions filed on her behalf seeking change of custody. Mother seemed satisfied to permit the State of Florida to take care of her child; and was not interested in making any effort to have the child returned to her.
Such testimony as to abandonment does not prejudice mother's defense. Her defense must rely on the facts, not a name tag such as neglect or abandonment. For mother to claim that she was prepared to defend against neglect but not abandonment is not logical.
... .
ORDERED AND ADJUDGED that the dependency of said child, [C.M.H.], is hereby affirmed and said child is hereby permanently committed to the Florida Department of Health and Rehabilitative Services, for subsequent adoption.
Affirmed.
LARRY G. SMITH and SHAW, JJ., concur.