444 So.2d 981 (1983)
IN the INTEREST OF A.B., a Child.
Willie Mae BROWN, Appellant,
v.
STATE of Florida, Appellee.
No. AQ-331.
District Court of Appeal of Florida, First District.
December 30, 1983.
*983 Christina A. Zawisza and Mary Kay Williams, Jacksonville, for appellant.
Jim Smith, Atty. Gen., and Bruce Barkett, Asst. Atty. Gen., Tallahassee, for appellee.
ROBERT P. SMITH, Jr., Judge.
Mrs. Brown appeals from a circuit court order continuing her ten year-old daughter's temporary commitment to the Department of Health and Rehabilitative Services, in foster home care, and authorizing the foster parents to take the child with them from Jacksonville to their new home in Cleveland, Ohio. When Judge Safer entered this order in December 1982, the child A.B. had "temporarily" been placed in HRS foster home care for eight of her ten years. Periodic judicial review of the placement, see § 409.168, Fla. Stat. (1981), and In the Interest of V.M.C., 369 So.2d 660 (Fla. 1st DCA 1979), began in 1977. Judge Safer's order recognizes, with characteristic sensitivity, that the child A.B. was taken initially into the state's care to protect her from neglect by her father, and that by continuous foster care to this day, this child has virtually been weaned from her mother. Mrs. Brown recognizes this, too, and she complains of it.
The circuit court considers that "the best interest of the child," particularly as it is affected by her emotional instability and her mother's relative inability to recognize or cope with it, requires that the child continue in foster care and in this particular home, now moved to Cleveland. That home qualifies, because of the training and disposition of the foster parents, as a therapeutic foster home in which only one child may be placed. HRS reported to the court that no other suitable foster home is available *984 in Jacksonville for A.B. The issue, then, is whether these circumstances justify the continued, now virtually terminal separation of A.B. and her mother.
Though we have no transcript of the 1982 hearings before Judge Safer which produced the order appealed, the order is abundantly detailed in factual findings as well as in reasoning supporting the action taken. We therefore may and do accept the factual statements in the order, together with the history revealed in numerous HRS reports and other documents filed over the years, as the basis of our review. Mrs. Brown's motion to strike the supplementary record filed by the Attorney General is denied. The Attorney General's suggestion at oral argument that the order appealed be affirmed for want of transcripts is denied. Fla.R.App.P. 9.200(f). Despite opportunities to do so, no party has offered transcripts or a stipulated statement, R. 9.200(b)(3), as essential to our consideration of this appeal.

I.
The eldest child in this black family was declared dependent and placed in foster care in 1962, before his first birthday. Of him this record tells us nothing more than that he was still under the state's control in foster care 16 years later. In 1974 the remaining five children, ranging from A.B. not yet two years old to another girl ten, also came under the state's control. That happened when the state children's agency, responding to Mrs. Brown's call for help, filed and the circuit court granted a dependency petition. For grounds the petition alleged and the court found that the father kept the family virtual prisoners, isolated from school and other worldly contacts, on an island in the St. Johns River dubiously named Mt. Pleasant.
In the more than eight years that elapsed before this appellate record closed in December 1982, five circuit judges entered orders touching upon the children's care in foster homes, emergency shelters and hospitals. One child died in foster home care; the two elder children, aged 19 and 15 as we consider this case, "seem to have severed emotional ties with their mother and are not interested in living with her," according to HRS report; the youngest son began counseling for "defiant behavior" at age ten, in 1981, and he remains in "stable" foster home care. Then there is the very youngest, this daughter whom for confidentiality we identify as A.B.
A.B. was described in a 1980 agency report as "probably the most problematic of the Brown children. She has stolen money at both school and home and wets her clothes both day and night":
[She] was recently transferred from Southside Estates Elementary School where she is in emotionally handicapped self contained classroom. In her regular classroom she made a nuisance of herself, according to her teacher, by irritating the other children. Her teacher felt that she was basically insecure and would do anything for attention.
Later testimony characterized the child A.B. as "hyperactive, outbursts of temper, need for constant supervision." The child requires Mellaril medication regularly.
By 1981 A.B. had lived seven years with two brothers in a Jacksonville foster home. Then at midyear one of the boys, aged 12, suddenly died. On motion of the mother, assisted by a Legal Aid lawyer since 1978, the court ordered A.B. and her surviving brother placed in new foster homes. But first A.B. was hospitalized among disturbed children in Northeast Florida State Hospital, at Macclenny, which HRS then decided was "not an appropriate placement." But A.B. stayed there two or three months longer, evidently because of her unstable emotional condition, until a psychologist advised the court that "the longer she stays at the hospital the more possibility and probability she will act like other children there who are emotionally disturbed." And so, at year-end 1981, the court placed A.B. in the "therapeutic foster home"  offering special care to one child only  of the Jacksonville couple whose move to Cleveland within a year prompted *985 the October 1982 hearing and the December order now appealed by the mother.
Through it all Mrs. Brown has asked for return of her children. She departed the St. Johns River island when the children did, in 1974. In December 1974, living apart from her husband in Jacksonville, Mrs. Brown initiated the court's first review of the foster home placement orders. She divorced her husband and testified, seven years later, that an HRS counselor advised her "she had to divorce her husband in order to have the children returned to her." Without attempting to guess whether that advice was literally given as understood by Mrs. Brown, the circuit judge recorded the simple facts: "She divorced her husband and the children were not returned."
After what appears to be about three years, Mrs. Brown moved from Jacksonville to Jesup and then to Ludowici, Georgia, later saying she did so to get away from her former husband, who nevertheless continued to call her his wife and followed her to Georgia. As this truncated record closed in December 1982, Mrs. Brown was seeking public housing in Hinesville, Georgia. There or in Brunswick she had received medication of some sort, until she unilaterally discontinued it, and she has been counseled for mental health, in parenting skills and for alcohol abuse.
Mrs. Brown was thus encouraged by Florida and Georgia counselors to prepare herself to receive her children, or at least A.B., again within her home. As recommended by HRS she prevailed on her landlord to add plumbing and another bedroom to her Ludowici house. She has asked at every opportunity that A.B. and other children be returned to her. "At every hearing," Judge Safer wrote, "the mother asks, What must I do to have the child returned to me?" Mrs. Brown testified, so the court noted, "that the State took children away from her and never returns them." To this Judge Safer added: "Nothing can be gained from a review of her experience with foster care except that ... her contention is borne out by the facts."
None of the several counselors whose reports are in this record has ever recommended that A.B. or any other child be returned contemporaneously to Mrs. Brown. Their reports uniformly recommend continuing foster home care. A 1980 report is rather typical: "Our home study from Georgia indicates that the natural mother's situation is not such that she could be depended upon to meet these needs" of the children:
Mrs. Brown is receiving Social Security benefits in the amount of $208.20 a month for a disability. She has made some improvements to her home, but otherwise her situation has remained unchanged for the last year. According to our home study from Georgia she continues to maintain an unstable lifestyle and stays in trouble with the law. It is also alleged that she has a serious drinking problem and that she would be unable to give the children the supervision they need.
Mrs. Brown has always been able to visit her children in their foster homes but has not seen the younger children since December of 1978 when we last had a hearing. She has called several times during the past year to talk to them, the last time being in November [1979] when she indicated she had Christmas presents for them which they have yet to receive. Her daughter [L., the eldest] found out she was here without trying to see her and was terribly hurt. She indicated to the worker at the time that she no longer wanted anything to do with her mother.
Mrs. Brown's visits with A.B. at Jacksonville in recent years appear not to have been particularly successful. When confined at Macclenny, A.B. became quite agitated during her mother's visit, so much so that the authorities there barred Mrs. Brown from further visits. In August 1982, during her mother's visit, A.B. "became hyperactive to a point that she was out of control. It took at least 20 minutes *986 for her to calm down again after we left the room... ." Again in October, during a joint counseling session for A.B. and her mother, the child "didn't want to listen or do as Mrs. Brown requested, discipline problem."
Since 1980, when legislation required it as an impetus for family restoration, Mrs. Brown and HRS have entered either two or three "performance agreements" specifying what Mrs. Brown must do to achieve the agreed goal, that A.B. and the two younger children would be returned to their mother's custody. The last of those agreements was signed in November 1982, after the October hearing and after A.B. left for Cleveland with her foster parents, but before Judge Safer reduced to writing, in December, the order now before us. A predecessor judge had ordered "that a reasonable service agreement shall be prepared" in April 1980, but the only performance agreement of record before Judge Safer at the October 1982 hearing was one dated August 1981, which recited that "[t]he Court shall return" the three children to Mrs. Brown at the end of February 1982, at the expiration of the agreement, "if there has been substantial compliance" by Mrs. Brown. Its terms were:
1. Mother must obtain & maintain housing with plumbing, utilities & 3 bedrooms.
2. Mother will engage in mental health counseling. Discussing parenting skills and alcohol maintenance problems if assessed to be pertinent by the counselor. The counselor will determine the frequency of the counseling for the duration of this agreement. The mother will miss no more than 3 counseling sessions and the counselor will supply H.R.S. with progress information concerning [Mrs. Brown].
The same agreement provided that Mrs. Brown would visit the children in Jacksonville every other month and that "[i]n the event we receive approval from Georgia's Interstate Compact office, weekend and other longer visitation in Georgia will occur." The Georgia visits apparently did not take place.
The November 1981 report to the court related the Georgia counselor's opinion "that said mother has really been `trying' to uphold her end of the Performance Agreement. [Mrs. Brown] has taken the responsibility in initiating counseling which will finally begin next week. Also, said mother has maintained visitation with said children accordingly and on schedule... ."
December 1981 seems to have been a turning point in the court's and HRS counselors' perceptions of Mrs. Brown's progress toward reunification with A.B. and the youngest son. By this time, the next youngest daughter was added to the list of those who had become bonded to foster parents. In the December 1981 hearing that child was described by the HRS counselor as "so attached to the foster parents that it is doubtful that she could ever return home." But the staff psychologist at Jacksonville's Children's Crisis Center expressed other views about the youngest son and A.B. The boy, he said, "had no sense that [his former foster mother] is his permanent caretaker; he could begin to reestablish a relationship with mother and probably could be returned to mother in the future." Similarly, A.B. "has no sense that [her foster mother at that time] is her permanent caretaker; she could begin to re-establish a relationship with mother after a sufficient time to adjust to the therapeutic foster home." Though he knew nothing of Mrs. Brown's alleged drinking problems, the psychologist testified that he "found no need for mental health counseling." Mrs. Brown herself testified, according to the court's order:
In order to obtain better housing as suggested by Georgia counselor, her landlord added a bedroom to her house. She doesn't know what else she is supposed to do. She arranged her own counseling. She has quit drinking... . Although she has good friends in Georgia, she would move back to Jacksonville if that would help her obtain her children.
*987 The court then ordered, in December 1981, that A.B. be placed promptly in the therapeutic foster home that later would move to Cleveland, ordered that HRS arrange continued visits by Mrs. Brown with the three younger children in Jacksonville, and dispensed with the mother's mental health counseling, saying that counseling "should not be considered as a requirement for substantial compliance with the current performance agreement."
Then HRS filed this disturbing report in January 1982:
[Mrs. Brown] stated at the Judicial Review hearing of 12/11/81 that she has not consumed any alcoholic beverages since the first anniversary of the death of her son, [D.]. To the contrary, this agency has received several reports which seem to indicate that she has an alcohol abuse problem. As stated in the letter of 01/16/82, to Judge Louis Safer, the foster parent [of the youngest one] reported that [Mrs. Brown] was highly intoxicated and very inappropriate during the visit to the [foster] home on 12/08/81. Furthermore, a report was received on 12/17/81 from the director of the Department of Family Services in Ludowici which alleges that [Mrs. Brown] was found in an inebriated state when a visit was made to her home in September. Also, Dale Barlow and Dr. Dowling of Northeast Florida State Hospital, made the unsolicited observation that [Mrs. Brown] appeared to have just come off a drinking binge during her visit to the facility on 12/05/81.
The report "again suggest[s] that [Mrs. Brown] should consider moving back to Jacksonville." It is not clear from this record whether, when or how strenuously HRS recommended directly to Mrs. Brown that she return to Jacksonville. That was not made part of the performance agreement.
In January and April 1982 Judge Safer convened further review hearings and entered orders reinstating Mrs. Brown's mental health counseling at Brunswick, Georgia; requiring her to participate in the counseling, in Jacksonville, of each of the three younger children; requiring her to attend "parenting skills classes" to be arranged by HRS; and continuing her rights of visitation with the children.
On October 22, 1982, then, the issue before the court was whether the foster parents, with whom A.B. had lived in Jacksonville since the previous December, should be permitted to take the child with them to their new home in Cleveland. Two days before the hearing HRS submitted a written "status report of the degree and extent of compliance by all parties with each provision outlined in the Performance Agreement... ." The report set out the "performance" Mrs. Brown was to have accomplished, according to the August 1981 agreement quoted above in substance; and the report represented, by a checkmark in the affirmative rather than in the negative box on the printed form, that Mrs. Brown was in "substantial compliance" with that agreement. Inexplicably, though the August 1981 performance agreement stated that "[t]he total period for the accomplishment of the goal of returning custody of the child to Willie Mae Brown is from August 30, 1981, to February 30 [sic], 1982," the October 1982 report advanced the date: it stated that the goal "was to be accomplished by October 1984." The report concluded with a request that the court "continue the child(ren) in foster care," saying:
[The child A.B.] has been in her present therapeutic foster home since 12/16/81. She has adjusted well in placement. We felt that it is in [her] best interest to remain with the foster parents and accompany them to OHIO. [The child] and the foster parents have a good relationship. We also feel that it could be detrimental to [the child] at this point if they are separated.
Thus on October 22, 1982, the matter came on for hearing before Judge Safer. Over Mrs. Brown's objection, Judge Safer authorized the move, which took place in November, and by his December order the judge explained at length the failure of reunification efforts, A.B.'s continuing dependency *988 due primarily to her emotional disturbance, the absence in Jacksonville of another suitable foster home, Mrs. Brown's apparent inability to believe that A.B. is emotionally disturbed, the futility of the conditions placed in the August 1981 performance agreement, and the suitability of continued foster care by the foster parents now relocated to Cleveland.
The order states:
I have come to the conclusion that the underlying problem in this case is that it has been handled as though the child were a normal child with the idea that the usual foster care procedure would successfully return the child to the mother.
Judge Safer thus concluded that judicially ordered reunification of Mrs. Brown and A.B. was not in the best interests of the child at that time and was not likely ever to be:
The child should know who her mother is and hopefully at a later date, when the child becomes stable and matures, the child might decide on her own to live with the mother. For the present the child should remain in foster care and efforts should be concentrated on communication, not reunification.
The order concludes by requiring regular communication between A.B. and her mother and siblings; forbidding the foster parents to begin adoption or other custody proceedings in Ohio without the court's permission; scheduling future review hearings; and stating:
If permitted by law (and I will let HRS attorney advise the counselor on this), the performance agreement should be replaced by a permanent placement plan. In any event, something current must be filed with the Court by the hearing [set for December 20, 1982].
In the meantime, after the October 1982 hearing but before the December order, HRS entered into another performance agreement with Mrs. Brown, again stating a joint goal of reuniting the child A.B. and her mother. The agreement required continued counseling of the mother in Brunswick and of the child in Cleveland, and it required Mrs. Brown to "apply for a 3 bedroom apartment with the housing authority in Hinesville, Ga., and hopefully be approved for an apartment by 01/83." The agreement states that "the established goal" of reunification "will be accomplished" by October 1984.
The last HRS staff report in this record, December 16, 1982, notes the child's entry into a Cleveland school and the foster mother's contact with support personnel there:
[The foster mother] feels that [A.B.] has undergone somewhat of a personality change for the better since their arrival. No doubt the commitment the [foster parents] have made to this child and the fact that she has literally been able to put distance between herself and the negative aspects of the past have contributed to this.
The foster parents are shown by this record to be well suited by aptitude and experience for the nurturing task they have undertaken.

II.
There is no scarcity of old and recent caselaw on the entitlement of natural parents to that relationship with their children and the entitlement of children to grow up unscathed by parental abandonment, abuse or neglect. The abundance of judge-made doctrine on the subject of parental custody, surviving to this day of comprehensive statutes, is no doubt modern evidence of the historic doctrine that "Courts of equity have inherent jurisdiction to protect infants," who are "wards of the Court." Pollack v. Pollack, 159 Fla. 224, 31 So.2d 253, 254 (1947), so saying, was a case of custody arising from a divorce, in which equitable powers were also independently grounded; Fisher v. Guidy, 106 Fla. 94, 142 So. 818, 821 (1932), which Pollack cited, asserted independently of divorce the "inherent jurisdiction" of equity courts "to control and protect infants" from "misbehavior or unfitness" in their guardians. See also the more recent statements to the *989 same effect, in State, Department of Health and Rehab. Services v. Hollis, 439 So.2d 947 (Fla. 1st DCA 1983).
We are not here concerned with competing claims to a child's custody by divorced parents, or by one of them and another relative, ancillary to marriage dissolution proceedings first begun by one of the parents.
This is rather of the class of cases in which the competing custodial claims are the parent's claim and, in the interest of the child, the state's claim. The court's superintendence arises not from its jurisdiction of a divorce petition by one parent against the other, but from the child's condition of dependency by reason of abandonment, abuse or neglect at the time of that determination. Here as in many such cases the question of restoring parental custody arises long after the original cause of the child's dependency has disappeared, when the state asserts (or the court finds independently) that for another reason the child should not be returned to the insisting parent.
In such cases as this, the notion of parental abandonment has no relevance whatever. There is no basis for a finding, and the circuit court made no finding, that Mrs. Brown has abandoned interest in A.B., and so on that ground has relinquished not only her right of custody but other, perhaps all, parental rights. Cf. In the Interest of T.G.T., a child, 433 So.2d 11 (Fla. 1st DCA 1983) [permanent commitment for adoption after abandonment]; In re: The Adoption of J.G.R., 432 So.2d 735 (Fla. 4th DCA 1983) [no abandonment by father, no adoption by stepfather]; Jenkins v. In the Interest of C.A.J., 434 So.2d 9 (Fla. 1st DCA 1983) [citing T.G.T., supra]; Nelson v. Herndon, 371 So.2d 140 (Fla. 1st DCA 1979) [no abandonment, no adoption]; Ramos v. Sanabria, 429 So.2d 838 (Fla. 3d DCA 1983) [no clear and convincing evidence of abandonment, no adoption]; V. v. State, Department of Health and Rehabilitative Services, 427 So.2d 1082 (Fla. 1st DCA 1983) [abandonment permits permanent commitment for adoption]; In re Adoption of Cottrill, 388 So.2d 302 (Fla. 3d DCA 1980) [no abandonment, no termination of parental rights, no adoption]; In re Interest of D.A.H., 390 So.2d 379 (Fla. 5th DCA 1980) [no abandonment, no termination of parental rights, no adoption]; In re Interest of R.J.C., 300 So.2d 54 (Fla. 1st DCA 1974) [after parental abandonment, custody awarded to grandmother despite mother's consent to a stranger's adoption]. Contra, In the Interest of S.B.B., 379 So.2d 395 (Fla. 4th DCA 1980).
Almost uniformly, therefore, Florida courts have required clear and convincing evidence of parental abandonment before terminating parental rights by adoption or commitment to HRS for adoption. But at the same time we deny a parent custody on account of abuse or neglect or, as we say, for the "best interest of the child." We therefore access foster home care, and frequently the result is that "dependent children ... grow up without ever knowing a permanent family." S.B.B., supra, 379 So.2d at 397. The child fortunate enough to find a relatively "permanent family" in foster care encounters another consequence of our unwillingness to terminate parental rights absent abandonment: the persons whom the child "looks upon as her parents may not become her legal parents." Nelson, supra, 371 So.2d at 141 (Mills, J., specially concurring).
In an effort to remedy this appalling ambiguity in the lives of dependent children, at least for those placed formally in foster care by HRS and court action, the 1976 Legislature enacted two significant amendments to chapter 409, Florida Statutes ("Family Services"). One of those, not especially pertinent here except as it verifies the purpose of the other, provided financial subsidies for permanent adoptions of children having "special needs" as defined then and thereafter. Sec. 409.166(2)(a), Fla. Stat. (1976 Supp.), (1981). That statute emphasizes "every child's right to the security and stability of a permanent family home" and a purpose "to reduce state expenditures for long-term *990 foster care." The intent of the law was expressed in section 409.166(1):
It is the intent of the Legislature to protect and promote every child's right to the security and stability of a permanent family home. The Legislature intends to make available to prospective adoptive parents financial aid which will enable them to adopt a child in foster care who, because of his special needs, has proven difficult to place in an adoptive home. In providing subsidies for children with special needs in foster homes, it is the intent of the Legislature to reduce state expenditures for long-term foster care. [§ 409.166(1), Fla. Stat. (1976 Supp.)].
The companion enactment of the 1976 session, which has more importance here, required HRS and court review after a child has been in foster care continuously for six months. That review is to determine whether "the child should be continued in foster care or returned to a parent, guardian, or relative, or if proceedings should be instituted to terminate parental rights and legally free such child for adoption." Sec. 409.168(3)(a), Fla. Stat. (1976 Supp.). Again the legislature's emphasis on the desirability for "a permanent home for children in foster care" was stated in the text of the law:
The Legislature finds that 7 out of 10 children placed in foster care do not return to their biological families after the first year and that permanent homes could be found for many of these children if their status was reviewed periodically and they were found eligible for adoption. It is the intent of the legislature, therefore, to help ensure a permanent home for children in foster care by requiring a periodic review and report on their status.
In 1980 the legislature amended section 409.168 to provide a new tool in aid of limiting recourse to foster care and to "protect and promote every child's right to the security and stability of a permanent family home." That new incentive is the "performance agreement," a plainly-worded written agreement signed by the parents, by HRS or another agency responsible for the foster home placement, and if possible by the child, having this prescribed purpose:
... to record the actions to be taken by the parties involved in order to quickly assure the safe return of the child to his parents or, if such return is untenable, the permanent commitment of the child to the department or licensed child-placing agency for the purpose of finding a permanent adoptive home. [§ 409.168(3)(a)1, Fla. Stat. (1980 Supp.), (1981)].
The performance agreement must state the parents' financial obligations for support of the child in foster care, the parents' visitation rights and obligations, and "[t]he date on which the child is expected to be returned to the home of the parent or parents." Sec. 409.168(3)(a)6f. The agreement must also state the cause of the present disruption of natural custody and the steps to be taken to restore it. Thus the agreement is to include:
The specific reasons for the placement of the child in foster care, including a description of the problems or conditions in the home of the parent or parents which necessitated removal of the child from his home and the remediation of which determines the return of the child to the parent or parents; [and]
The specific actions to be taken by the parent or parents of the child to eliminate or correct the identified problems or conditions and the period during which the actions are to be taken. The parties to the plan may also include, but need not be limited to, other persons or agencies who shall agree and be responsible for the provision of social and other supportive services to the child or the parent, parents, or other custodian of the child. [§ 409.168(3)(a)6 and b, Fla. Stat. (1980 Supp.), (1981)].
A copy of the performance agreement is to be submitted promptly to the court. Sec. 409.168(3)(a), Fla. Stat. (1981). The signatories have authority to amend a performance *991 agreement, as has the court independently. Sec. 409.168(3)(d).
A performance agreement is to be limited in duration "to as short a period as possible for accomplishment of its provisions," and shall expire no later than "the date of the second annual judicial review," unless the court "finds by clear and convincing proof that the situation of the child is so extraordinary that the agreement should be extended," and in that event the agreement may be extended only for six months, after each of which "the court shall again review the child's status." At the expiration of the agreement, the child in foster care is either to be "returned to the physical custody of his natural parents" or "the social service agency shall initiate permanent commitment proceedings pursuant to s. 39.41... ." Sec. 409.168(3)(c).
The evident effect of these provisions, now on the books for more than three years, is to require an affirmative effort to identify to the natural parent the problems or conditions in the home that account for the child having been removed and kept in foster care; to assist the parent in making a personal commitment, assuming the parent's cooperation, to remedy those specific conditions; to notify the parent that, pursuant to section 39.41(6)(b), "the court shall return the child to the custody of the natural parents upon expiration of the agreement if the parents have substantially complied with the agreement," § 409.168(3)(a)6h; finally, should the parents not have "[c]omplied with their responsibilities as specified in the written performance agreement, although able to do so," then "proceedings to terminate parental rights" are required. Sec. 409.168(3)(g)1.
Underscoring the decisive purpose of the 1980 amendments to chapter 409, the legislature simultaneously added to chapter 39, "Proceedings Relative to Juveniles," section 39.41(6)(b), providing:
With respect to a child who is the subject of a performance agreement under s. 409.168, the court shall return the child to the custody of the natural parents upon the expiration of the agreement if the parents have substantially complied with the agreement. However, the court shall not terminate its jurisdiction over the child until 6 months after the return. Based on a report of the department or agency and any other relevant factors, the court shall then determine whether its jurisdiction should be continued or terminated; if its jurisdiction is to be terminated, it shall enter an order to that effect. [Emphasis added.]
If these statutes are to be treated seriously, as surely they must, the conclusion is inescapable that two historic doctrines often posed in polar opposition to each other  the right of natural parents to continued parental relations with their child unless they have abandoned the child, on the one hand, and the perceived "best interests" of the child in long-term foster care, or in some other disposition, on the other  have been significantly altered by the legislature. In the overriding interest of promoting "every child's right to the security and stability of a permanent family home," section 409.168 now presses HRS and the court to make a decisive choice: either the child must be returned to the natural parents, after they have satisfactorily remedied stated conditions that cause the child's dependency; or, failing that, proceedings are to be had terminating parental rights and placing the child permanently with HRS for adoption or other placement.
Thus a meaningful performance agreement between the parent and HRS has become central to the strategy for securing each child a permanent home with his legally recognized parent.

III.
The legislature having thus responded to the problem described by Judge Baker in S.B.B. and by Judge Mills in Nelson, the courts and HRS have responsibilities to pursue the chosen strategy vigorously and with initiative. Whatever reason there may have been to disparage performance agreements before the 1980 legislation gave them stature, see Carlson v. *992 State, Department of Health and Rehabilitative Services, 378 So.2d 868, 869 n. 1 (Fla. 2d DCA 1979), there is none now. A meaningful performance agreement, amended or extended as the circumstances require, now embodies standards for a parent's legitimate expectation of reconciliation with her child and for the eventual decision, if one must be made, to terminate parental rights.
On this subject sections 39.41(6)(b) and 409.168(3)(a)6h are clear: the performance agreement notifies the parent that "the court shall return the child to the custody of the natural parents upon expiration of the agreement if the parents have substantially complied with the agreement"; and, albeit with continuing supervision "after return of the child to its parents," the court "shall return the child to the custody of the natural parents upon expiration of the agreement if the parents have substantially complied with the agreement."
Section 409.168 requires that the terms of the performance agreement relate to the present or continuing dependency of the child. As this case proves, that continuing dependency may be due to conditions entirely different from those which required a dependency adjudication some time earlier. The Brown children, for example, were freed of their father's doleful influence by their physical removal from Mt. Pleasant Island in 1974, and by Mrs. Brown's divorce shortly afterwards. Yet A.B. and the others remained dependent because of Mrs. Brown's perceived lack of understanding, other poverties, and troubles with "the law" and with alcohol. A.B.'s particular dependency was compounded by her own emotional disabilities, which require more than ordinarily attentive parenting.
The question of the child's present dependency, or not, is especially relevant when the issue of permanent commitment for adoption arises some time after the original adjudication of dependency. In J.G.R., for example, the father's conduct, held sufficient to refute an abandonment claim, was his parental attention to a child no longer in his custody. Post-adjudication inattention by the father in V., supra, likewise accounted for the permanent commitment sustained by this court. The child in J.L.P. was one day old when taken into temporary custody as a dependent, and considerably later the child was permanently committed after "[t]he trial judge gave appellant [mother] ten months to establish an environment fit for the child, free of neglect and abuse," and she failed to do so. See also, among others, S.B.B., Carlson, and Cottrill, supra.
Necessarily, then, the question of child's present dependency, or not, is critical when the court periodically reviews the child's continuing foster home care, or considers permanent commitment, and in either case inquires whether parental custody may be restored. The pertinent question cannot rationally be otherwise; for if an early dependency adjudication concludes the dependency issue entirely and for all time, to encourage parental cure of dependency conditions, under a performance agreement or otherwise, would be a cruel charade. See In Interest of C.M.H., 413 So.2d 418, 424 (Fla. 1st DCA 1982).
It is true that C.M.H. said also (coincidentally in Judge Safer's words, adopted by the court) that a determination of dependency "became res judicata during all further proceedings," and "the issue of dependency was laid to rest." 413 So.2d at 424, 425. As a matter of formal logic, that reasoning leaves only "the best interest of the child" to govern the choice between restoring the child to the parent or continuing foster care, or between committing the child permanently to HRS for adoption and one of the other two choices.
We cannot consider that C.M.H. installed "the best interest of the child" as a license for permanent commitment, or for continuing foster home care, if the child is not in fact presently dependent by parental abandonment, abuse or neglect. Had the court in C.M.H. considered the dependency inquiry concluded in 1981 by the 1976 adjudication, there was hardly need to rehearse all the evidence of "abandonment" by the *993 mother during the child's temporary commitment to HRS. 413 So.2d at 425-28. Admittedly C.M.H. declared those recitals "not necessary," 413 So.2d at 428, but they were the basis of the court's conclusion concerning the "best interest of the child."
Conceding a superficial conflict between our view of statutory requirements and the court's analysis in C.M.H., the conflict is of no consequence if, as appears, C.M.H. simply poured meaning from the broad concepts of abandonment, abuse, and neglect into a broader concept, "the best interest of the child." If C.M.H. intended rather that "best interest of the child" in foster care should be a freestanding test, indeterminate except from an individual judge's value system, we respectfully disagree. Such a view would render inconsequential any performance agreement between the parent and HRS, even if the court had become privy by modifying the agreement. Performance agreements are designedly addressed to improving the parental capacity of a displaced parent who has no other control over what may be considered the "best interest of the child." Moreover, though Judge Mills proposed such legislation by his separate opinion in Nelson, supra, 371 So.2d at 140, the legislature has not enacted "best interest of the child" as a freestanding criterion for foster home placement or permanent commitment. Rather, the 1980 Legislature chose to attack the problem of foster care indeterminancy by performance agreements, as we have seen.
The heart of the matter may be put rather simply. If "the best interest" of A.B. is the sole and unelaborated criterion for present disposition, simply because dependency was adjudicated when Mrs. Brown needed and got specific help years ago, then despite any successful efforts now to improve her parenting and the home, a judge may think, in the child's "best interest," that A.B. should have a fuller life with more desirable parents in Cleveland. If that seems so by clear and convincing evidence, see C.M.H., 413 So.2d at 425, the child would be permanently committed for adoption, presumably by those preferred parents; and if it seems so by only a preponderance of the evidence, "temporary" foster care by those or other surrogates continues indefinitely. In either case the purpose of the 1980 legislation is wholly defeated.
For good reason the legislature preferred an active process toward reconciliation or permanent separation over a passive system of relying upon a judge's perception of the "best interest of the child." That naked test demands more wisdom than Solomon's, and its discriminatory ramifications, penalizing the poor by reparenting their children to more affluent candidates, are distressingly evident.[1] We cannot attribute such a purpose to C.M.H., for the decision mentioned neither a performance agreement nor the legislation requiring it. We assume rather that the court in C.M.H. was without the benefit of a performance agreement, as perhaps many were in the transition period following 1980. Cf. Pingree v. Quaintance, 394 So.2d 161 (Fla. 1st DCA 1981), in which HRS cited budgetary limitations deterring the six-month judicial review required by 1977 legislation.
Dependency due to parental abandonment, though the child is absent in foster care, is of course a demonstrable thing. C.M.H. pointedly did not say otherwise. But C.M.H. did ask rhetorically, "how would it be possible for a parent to be guilty of either [abuse or neglect] if the child were removed from the home?" 413 So.2d at 424. That is simply a matter of prediction, confirmed if necessary by observation *994 "after the return" of the child, § 39.41(6)(b). Either neglect or abuse may be proved prospectively, as was held by In the Interest of J.L.P., 416 So.2d 1250 (Fla. 4th DCA 1982). There the court disregarded the parent's poverty, recognizing that human dignity is not found exclusively, nor even necessarily, in persons and homes better situated; but the court found in the mother's promiscuity and squalor a "considerable risk of abuse" to a child not then exposed to it. The court so justified permanent commitment after a designated period for marked improvement by the mother, and the period was fixed in the manner of a performance agreement. For other judicial predictions of abuse or neglect, see Carlson, supra, 378 So.2d at 869, citing alcohol abuse and nonsupport during the child's absence; S.B.B., supra, 379 So.2d at 396, citing one parent's advanced age and medical problems and the other's "retardation" or fearful nature, though the decision did not in terms find likely "neglect" on that account; Cottrill, supra, 388 So.2d at 305, citing the mother's alcoholism during the child's absence, but refusing permanent commitment on that ground; Partin v. State, 396 So.2d 272, 275 (Fla. 3d DCA 1981), citing the mother's "poor judgment" and the consequent "danger" to the child if returned.
Predicting a parent's "fitness" for again parenting a child presently in foster care is not unlike predicting the parent's fitness, with a freer judicial hand in that event, when the former parent petitions to adopt the child after permanent commitment for adoption. See In the Interest of T.G.T., 433 So.2d 11 (Fla. 1st DCA 1983); Green v. State, Department of Health and Rehabilitative Services, 412 So.2d 413 (Fla. 3d DCA 1982).
In the case of children in foster care,[2] therefore, it is no embarrassment to sound disposition that a child's condition of "abuse" or "neglect," and therefore of continuing dependency, must be determined prospectively long after the child by adjudication of dependency has been removed to foster care.
We thus summarize our understanding of the principles and processes governing such a case as this:
1. When a child has temporarily been committed for dependency, and by placement in foster care has been made subject to section 409.168, Florida Statutes, a performance agreement is required, and the Department, spurred by the court as necessary to produce a meaningful agreement with the diligence prescribed, will see to it. See S.B.B., 379 So.2d at 397.
2. The performance agreement will specify among other things "the problems or conditions in the home of the parent or parents which necessitated removal of the child from his home and the remediation of which determines the return of the child to the parent or parents." § 409.168(3)(a)6a. Since those "problems or conditions" are by law parental abandonment, abuse or neglect,[3] those problems or conditions are *995 to be reviewed retrospectively, presently and prospectively by the court, in compliance with the time constraints of section 409.168.
3. If at the end of the agreed performance the parent has substantially complied, the child shall be returned to the parents, subject to continued judicial supervision for six months as prescribed by section 409.168(3)(a)6h. See also section 39.41(6)(b). The court's jurisdiction thereafter, if continued because of continued dependency or a substantial risk of it, includes the power temporarily to recommit the child upon that stated ground, subject again to section 409.168 if the child is replaced in foster care.
4. If the parent has not substantially complied with the performance agreement as from time to time modified and extended within the limits prescribed by section 409.168(3)(c), and so has not alleviated the child's dependency past or in prospect, then, it being "manifestly in the best interests of the child to do so," § 39.41(1)(f)1, the court is to permanently commit the child for adoption.

IV.
The disposition order entered in December 1982 must be reversed and the case remanded for further and other action by HRS and the court.
The placement ordered for A.B. after eight years of institutional and foster home care  more of the same, but hundreds of miles more distant from the mother  is in law an unresolved ambiguity, serving neither of the goals established by statute for A.B.: reunification with her mother, or adoption into a new and permanent family. That the order is also compassionate, seeking yet another temporary accommodation of those goals after all these years, does not save it.
The order lacks a clear finding of A.B.'s dependency continuing through her mother's abandonment, abuse or neglect. In the place of these essential findings the order substitutes an insufficient finding that "the best interest of the child" requires that she go to Cleveland in foster home care. Certainly the order finds that A.B. "is not a normal child in that she has emotional problems" and that "mother is not prepared to care for child." "The doubt about mother's ability to take care of child currently arises in part," the order states, "from the mother's testimony that she does not believe the child to be emotionally disturbed."
Though these observations potentially support an ultimate finding that Mrs. Brown would likely neglect her child's needs for medication, professional counseling, and effective parental attention, that finding is absent. To the extent that meeting those needs requires financial resources, Mrs. Brown must be found "financially able," § 39.01(26), through public assistance or otherwise, if her neglect of the child is to be predicated on her likely failure to meet those needs.
A finding of neglect and therefore of dependency may of course be predicated on likely deprivations unrelated to finances. If Mrs. Brown by reason of ignorance, insensitivity or other personal handicaps is clearly likely to neglect A.B.'s needs, that finding would suffice. But to say that Mrs. Brown is "not prepared to care for child" is not equivalent; for to so prepare her, or by trial to demonstrate her incapacity to accept preparation, was the clear responsibility of HRS and the court, through performance agreements closely addressed to her perceived incapacities.
The order asks rhetorically, "What type of parenting skills classes will help mother learn how to parent an emotionally disturbed child?" If that is the pertinent question, it must be answered; and if from *996 metropolitan Jacksonville the answer is "there is no such thing," or "no such thing is available," that must be our shameful answer. If the answer is rather that Mrs. Brown either cannot or will not gain the necessary understanding from resources there available, that should not ordinarily be declared, under the statutory scheme, until she has been given the opportunity to prove otherwise, through conditions stated in a performance agreement. In section 39.41(6)(b) there is ample warrant to test a parent's increased sensitivity through actual experience with her child restored and with active assistance and oversight such as was ordered, in another but not dissimilar context, in Hill v. State, 358 So.2d 190, 209 (Fla. 1st DCA 1978).
Comprehensive and compassionate as the order is, it mentions no statute at all, and does not allude to the standards expressed by sections 39.41(6)(b) and 409.168(3)(d). The order appears to discard the process prescribed by legislation for the resolution of Mrs. Brown's being "not prepared" to care for her child. Mrs. Brown's question was "What must I do to have the child returned to me?" It is only half correct in law to say, as the order does, "the legal answer is that the mother can do everything required of her and the child may still not be returned to her because the final determiantion of custody depends upon what is in the best interest of the child."
That cannot be the full "legal answer" until the mother has done everything that reasonably can be required of her, and she remains "not prepared."
Mrs. Brown was reported in October 1982 to be in "substantial compliance" with her performance agreement. Obviously, then, the pertinent question is whether the state has required all it reasonably could to alleviate Mrs. Brown's "not prepared" condition. We note the court's observation of conditions as they existed in October 1982:
The child is in Jacksonville. The mother chooses to live in Georgia. This creates a problem of visitation, but it is not the fault of HRS. If the mother had resided in Jacksonville, there could have been coordinated mental health and parenting skills efforts involving the family, and the mother could meet regularly with the persons who are making decisions concerning the child. The fact that there must be coordination by telephone or letter is not the fault of HRS. The fact that counseling must be done separately is not the fault of HRS.
We do not undertake to dictate from this distance what might and should have been done, from the age of two onwards, or what can now be done, to reconcile this child and her mother. But it seems clear enough, from Mrs. Brown's "substantial compliance" with what was required of her, that Mrs. Brown would have attempted, and would now attempt, to comply with any conditions attached to her reconciliation with her child.
The question now is whether it is too late for further and more pointed efforts. Time is an inexorable influence in these cases, as the 1980 Legislature found. We ourselves are acutely conscious that another year has passed, with A.B. gone to Cleveland, while this appeal moved toward disposition. By the passage of time for this purpose, as well as by the state's removal of A.B. to foster care for eight years preceding the circuit court's order, we all have contributed to A.B.'s alienation from her mother, to her bonding to foster parents, and to her mother's inability or unwillingness to comprehend the child's special needs.
Continued separation of A.B. in foster care cannot relieve those conditions and will certainly exacerbate them. More pertinent for our purposes, the separation ordered in this case is not effectively aimed at preparing the mother and daughter for reconciliation. It is therefore unauthorized by statute.
Upon remand, then, the court will again consider what opportunities remain for vigorously pursuing reunification. If there are none, because the court considers Mrs. Brown's disabilities and the child's alienation and instability too intractable, by law the proper course after so many years is not more foster care but permanent commitment for adoption.
*997 In that event, by this decision which is too lengthy and inconclusive to serve any other purpose, Mrs. Brown's and A.B.'s travail is recorded to remind us of our failure.
REVERSED and REMANDED.
NIMMONS, J., concurs.
SHIVERS, J., dissents with opinion.
SHIVERS, Judge, dissenting.
I respectfully dissent and would affirm the order of the trial court. We have no transcript of the hearings before Judge Safer which resulted in the order appealed. This is reason enough not to reverse. However, assuming the findings of fact are correct, there is good and sufficient basis, upon which to affirm the thoughtful, but difficult decision of the trial court, that this particular child's present best interests lie with her foster parents.
NOTES
[1] See Smith v. Organization of Foster Parents for Equality and Reform, 431 U.S. 816, 97 S.Ct. 2094, 53 L.Ed.2d 14 (1977), citing evidence of discrimination against the poor in child placement systems, ostensibly for the "best interest of the child." Santosky v. Kramer, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982), summed it up: "The fundamental liberty interest of natural parents in the care, custody and management of their child does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State."
[2] In respect to children judged dependent but not placed in foster care, and so not subject to performance agreements, it may be possible, even conventional, to read the disjunctive "ors" in present section 39.41(1)(f)1d as yielding the test stated by Judge Safer and by this court in C.M.H.: that the matter of abandonment, abuse or neglect is historical, and that a freestanding inquiry, what is manifestly in the "best interest of the child," determines the child's disposition, even by permanent commitment. Before 1980 the statutes were more obviously susceptible to that construction. Sec. 39.41(1)(d), Fla. Stat. (1979) provided:

(1) When any child is adjudicated by a court to be dependent, the court having jurisdiction of the child shall have the power, by order, to:
.....
(d)1. Permanently commit the child to the department or a licensed child-placing agency willing to receive the child for subsequent adoption:
a. (I) If the court finds that the parent has abandoned, abused, or neglected the child; ¶ (II) ...; or ¶ (III) ...; and
b. If the court finds that it is manifestly to the best interest of the child to do so.
[3] "Neglect" is depriving a child of necessary food, clothing, shelter, medical treatment, or permitting a child to live in "an environment" causing or threatening significant impairment to health broadly conceived. § 39.01(26). To the extent these wants are financially remediable, the statute judges their deprivation as "neglect" only if the parent is "financially able." "Abandoned" is similarly conditioned, again not entirely in financial terms: the statute speaks of abandonment as a parent's failure, "being able," to make provision for the child's support or to communicate. § 39.01(1). "Abuse" contains another reference to volition: "abuse" is a "willful" act having a specified detrimental result. § 39.01(2). The other manifestations of momentary dependency, § 39.401(1)(b), (c), (d) and (e), presumably are of less consequence in long term "temporary" committals.