ERVIN, Judge,
dissenting.
I would reverse the order of permanent commitment on the ground that HRS’s failure to offer a performance agreement to the natural father before the entry of the order bars the court’s right to permanently commit the child. The majority takes the position that the lower court’s earlier order placing the child in the home of the maternal grandmother, and without department supervision, excuses the statutory requirement of a performance agreement, on the ground that the grandmother’s home cannot, under the circumstances, be considered a foster home. I would initially observe that the lower court, in adjudicating a child dependent, possesses no authority to remove the child from its parent’s home and place such child in the temporary care of any other person, without making the placement subject to the department’s supervision, in that the placement of all dependent children in the care of persons other than the natural parents is subject to HRS’s supervision and protection. See Section 409.145(2)(a), Florida Statutes (1983); In the Interest of K.H. and M.C., 444 So.2d 547, 550 (Fla. 1st DCA 1984) and T.W.S. v. Department of Health and Rehab. Serv., 466 So.2d 387 (Fla. 1st DCA 1985). Indeed, after the initial placement of a child in the home of a relative, the department has the authority to petition the court for a change in the placement. Section 39.41(l)(e).
Moreover, it is clear from the record before us, regardless of the language used in the dependency order, that HRS, throughout all stages of the case, assumed a very active role in having the child permanently committed. It was upon HRS’s petition that the child was declared dependent. It was by Gateway Community Services, a program funded in part by HRS, that the mother and father were evaluated for alcohol and drug abuse. Indeed, it was upon the department’s petition for permanent commitment that the order now on review was subsequently entered. Thus, whether the child was directed to be subject to the supervision of HRS is immaterial. In fact, despite HRS’s arguments now to the contrary, HRS’s actions below disclose that it correctly determined that the child was entitled to its supervision and assistance.
In holding that the child’s placement in the temporary care of its grandmother is not foster care, the majority relies upon the dictionary’s definition of the term foster, and reasons that because the term contemplates the affording of parental care by one not related through legal or blood ties, the maternal grandmother — related by consanguinity to the child — cannot, under the cir *1363 cumstances, be considered to furnish foster care. Although I do not think the common definition of the word foster necessarily excludes a blood relative, with no legal ties to the child placed in his or her care, from being considered a foster parent,[1] I would concede that the majority’s interpretation is consistent with certain statutes — other than section 409.168(2)(d), defining foster care — particularly sections 409.165(1) and (3) (providing for the department’s establishing and licensing of foster homes and other placement centers, and for the placement of children with relatives and other persons), and 409.175(2) (relating to standards for licensing of placement centers, other than in the home of the child’s relatives, where the child is placed in temporary care). I admit also that the pertinent rules reflect the agency’s preference for placement in the home of a relative, before “placement in an emergency shelter, ... crisis home, or ... referral for foster care_” Fla.Admin.Code Rule 10M-5.-03(3). See also Rule 10M-6.02(1), expressing the preference for placement “with the extended family of the child before exploring placement with foster parents unknown to the child.”
In my judgment, the term foster care, when used in the context stated in sections 409.145, 409.165, and 409.175, refers to the funding and licensing of approved foster homes, either foster family group homes, or foster family homes, i.e., residential homes, where children of a certain number and of specified ages are placed. See Rule 10M-1.02(36) and (37). When, however, the term is used for section 409.168(3)(a) purposes, requiring the preparation of a performance agreement within 30 days after the child’s placement in foster care, I regard foster care as necessarily embracing the temporary placement of the child in the home of a relative, once the court so acts pursuant to its powers of disposition under section 39.41(l)(b). Thus, while the majority’s position is consistent with the department’s interpretation, I nevertheless regard it as inconsistent with the legislative purpose that all children shall either be reunited with their natural parents, or placed for adoption as soon as possible, and, in order to achieve that purpose, a performance agreement is required. Section 409.168(1).
To understand the scope of the legislative intent, I consider it necessary to read the provisions of section 409.168, relating to the requirement of performance agreements, insofar as they pertain to involuntary custodial commitments, in pari materia with those of section 39.11, regarding the court’s general powers to permanently commit a child previously declared to be dependent. My belief that foster care necessarily includes a dependent child’s temporary placement in the home of a relative is supported by the legislative history of the two statutes.
The power of the circuit court to permanently commit a child is derived generally from the enactment of Chapter 26880, Section 1, Laws of Florida (1951), creating section 39.11(l)(d), which authorized the juvenile court, after it had adjudicated a child as dependent, to permanently commit the child to a licensed child placing agency for subsequent adoption if the court found that the child had been abandoned by the natural parent or parents, or that the parent or parents had substantially and continuously repeatedly refused to give the child parental care and protection, or that the parents were unfit by reason of their conduct or condition, which was seriously detrimental to the child’s welfare; and if the court found it manifestly to be in the best interest of the child to do so.
The court’s general powers to so permanently commit remained essentially unchanged through the 1975 legislative session — permitting the court to commit a *1364 child on the grounds of abandonment, or neglect, or the parents’ unfitness, or if a written consent for adoption had been executed, and “if the court [found] that it is manifestly to the best interest of the child to do so.” Section 39.11(l)(d), Florida Statutes (1975). Because, however, courts require clear and convincing proof of the statutory grounds authorizing permanent commitment, In the Interest of S.J.T. and T.N.T., 475 So.2d 951, 954 (Fla. 1st DCA 1985); Ramos v. Sanabria, 429 So.2d 838 (Fla. 3d DCA 1983), permanent commitment was often denied, but, at the same time, custody was also denied the parent, and foster care was continued, with the result frequently that “dependent children ... [grew] up without ever knowing a permanent family.” In the Interest of S.B.B., 379 So.2d 395, 397 (Fla. 4th DCA 1980).
As was extensively recited by this court in In Interest of A.B., 444 So.2d 981, 989-90 (Fla. 1st DCA 1983), in an effort to remedy a child’s prolonged status of dependency, the 1976 legislative session first provided financial subsidies for permanent adoptions of children having “special needs”, and, at the same time, emphasized “every child’s right to the security and stability of a permanent family home,” as well as the purpose “to reduce state expenditures for long-term foster care.” Sections 409.166(1) and .166(2)(a), (Supp.1976). During the same legislative session, section 409.168 was adopted, requiring both HRS and court review after a child had been placed in foster care continuously for six months, for the purpose of determining whether “the child should be continued in foster care or returned to a parent, ..., or if proceedings should be instituted to terminate parental rights_” Section 409.-168(3)(a) (Supp.1976). Section 409.168(2)(a) (Supp.1976) was also created, supplying the same definition for foster care as appears at Section 409.168(2)(a) (1983).
The legislature’s desire to provide a permanent home for children in foster care was stated in section 409.168(1) (Supp.1976) as follows:
The Legislature finds that 7 out of 10 children placed in foster care do not return to their biological families after the first year and that permanent homes could be found for many of these children if their status was reviewed periodically and [they were] found eligible for adoption. It is the intent of the Legislature, therefore, to help ensure a permanent home for children in foster care by requiring a periodic review and report on their status.
The 1978 legislative session also supplied three important legislative changes, insofar as they are pertinent to the discussion at hand: The Florida Juvenile Justice Act was created, Section 39.001, Florida Statutes (Supp.1978), and provided that one of the specific purposes of the chapter was
[t]o preserve and strengthen the child’s family ties whenever possible, removing him from the custody of his parents only when his welfare or the safety and protection of the public cannot be adequately safeguarded without such removal; and, when the child is removed from his own family, to secure for him custody, care, and discipline as nearly as possible equivalent to that which should have been given by his parents; ....
Section 39.001(2)(c) (Supp.1978) (e.s.).
The 1978 legislature also provided that dependent children, temporarily taken from the custody of their parents in accordance with the provisions of Chapter 39, shall be entitled to the protection and supervision of the department. Section 409.145(2)(a) (Supp.1978). Finally, until the enactment of the Florida Juvenile Justice Act, Florida Statutes, in 1978, the circuit court judge had no option regarding whether to place the child in foster care or in the custody of a relative who was willing to receive it. Section 39.10(6), Florida Statutes (1977), had formerly provided: “In all cases in which one or both of the parents of a child is unable or unfit to be awarded custody and in which the child has a close relative who is fit, ready, able, and willing to be awarded such custody, the court shall award the custody of the child to such close *1365 , relative and not to any foster home or agency of the state.” (e.s..) With the passage of the Juvenile Justice Act in 1978. subsection (6) was deleted. See Chapter 78-414, § 14, Laws of Fla. The result of the above amendments is that although the court now enjoys the discretion whether or not to place a child in the temporary custody of an adult relative willing to care for the child, Section 39.41(l)(b), Florida Statutes (1983), such placement must be subject to the supervision of the department, and, when the child is so removed, the care given him in the temporary home should be “equivalent to that which should have been given by his parents_” Section 39.-001(2)(c) (1983). Logically, then, the furnishing of temporary care to a dependent child in an environment nearly as equivalent to that which should have been furnished by the natural parent complies with the common understanding of the term foster: the furnishing of parental care to a child by one not legally obligated to do so.
In 1980, Section 409.168 was amended by Chapter 80-102, § 3, Laws of Florida, requiring the preparation of a performance agreement “[i]n each case in which the custody of the child has been vested voluntarily or involuntarily in the social service agency and the child has been placed in foster care_” Section 409.168(3)(a), Florida Statutes (Supp.1980) (e.s.). The legislative intent, originally set out in Section 409.168(1), Florida Statutes (Supp. 1976), was also amended in 1980 by adding the following language: “It is the intent of the Legislature that permanent placements with their biological or adoptive families be achieved as soon as possible for every child in foster care and that no child remain in foster care longer than one year.” To that end the preparation of a performance agreement was added to the existing requirement that there be a periodic review and report to the court on the status of children placed in foster care.
The same act which amended section 409.168, as aforesaid, also included within it substantial modifications to the court’s general powers of disposition, by adding provisions allowing commitment in the event “that the parent or parents have failed, upon expiration of a performance agreement entered into under s. 409.168, to substantially comply with such agree-ment_” Chapter 80-102, § 2, Laws of Fla., and authorizing the court to end its jurisdiction over a child previously declared dependent, with respect to a child who is the subject of a performance agreement, and permitting it to return the child to the custody of the natural parents upon the expiration of the agreement, if the parent substantially complied with the agreement; providing, however, that the court not terminate its jurisdiction until six months after the child’s return. Id.
If the majority’s position is correct — that placement of a dependent child in the home of a relative having no prior legal ties to the child cannot be considered foster care for section 409.168 purposes — a gaping exception is carved out to the legislative purpose behind the statute’s enactment, requiring the execution of performance agreements as a means of reunifying the child with its biological family, or, if attempts at reunification fail, placing it for adoption as soon as possible. Thus, by accepting the department’s argument that the placement of a child in the temporary legal custody of an adult willing to care for the child, pursuant to section 39.41(l)(b), is not, within the context of section 409.168, foster care, the child may be permitted to remain for an indefinite period of time in a potentially abusive environment, without being subjected to the mandatory review procedure required of performance agreements, which are to be limited in duration to as short a period as possible for accomplishment of the legislative purpose, and which are required, with certain exceptions, to expire no later than the date of the second annual judicial review. Section 409.168(3)(c).
If the biological relative does not desire to adopt the child, and in fact advises the department that he or she can no longer be responsible for the temporary legal custody of the child, such custody would necessarily have to be changed under the provisions *1366 of Section 39.41(l)(e), thereby prolonging the child’s indeterminate status and, con-comitently, subverting the legislative purpose of ensuring a permanent home for dependent children involuntarily removed from the home of their natural parents.
Moreover, under the majority’s construction of the statute, a natural parent’s right to be reunited with his or her child, previously placed in the temporary custody of a relative, is not coextensive with the right afforded to the parent when the child is placed in foster care. There is no alternative statutory plan to that of the performance agreement procedure prescribing the conditions of reunification with a dependent child in those situations in which a child is placed in the temporary custody of a relative willing to care for the child. If, as stated in Burk v. Department of Health and Rehabilitative Services, 476 So.2d 1275, 1278 (Fla.1985), “[Sjection 409.168 complies with public policy and protects the rights of the parent as well as the rights of the child and society[,]” surely a rule excusing the department from offering the parent the opportunity to participate in a performance agreement substantially impairs the parent’s rights, and undermines the public policy favoring the natural family unit in child custody disputes between the natural parent and a third party. Cf. In re Guardianship of D.A. McW., 460 So.2d 368 (Fla.1984).
As applied to the facts at bar, the failure of the lower court to require a performance agreement before the entry of the final judgment of permanent commitment worked a substantial disadvantage to the father. In its order permanently committing the child to the department for subsequent adoption, the court found that the child was dependent by reason of abandonment for over six months preceding the filing of the petition for permanent commitment. The court so found, notwithstanding that its prior order of dependency— based on the ground of neglect — had barred appellant from having any visitation with the child unless the court subsequently so ordered. Appellant now asks how he can be guilty of abandoning his child when he was under direct order of court not to visit the child until further order of the court? The department answers that the trial court entered several orders setting out the conditions of visitation, and had the father complied, the father, upon further order, would have been permitted visitation. Among other things, the department points out, the father was directed to make an appointment with the local community service provider for an alcoholic evaluation, to become involved in counseling or therapy, as recommended by the evaluations, and to pay $20 per week for support of the child. The record reflects that although appellant underwent the initial alcohol and abuse evaluations, he did not complete the evaluations, nor did he participate in an educational program as required, and at no time did he submit to a mental health evaluation as ordered. Finally, during the entire period of the cause, from November 11, 1983 through the dates of the two final hearings, July 18, 1985 and August 16, 1985, he made only two support payments for the benefit of the child.
Although the evidence in the case at bar may comply with section 39.01(l)’s definition of abandonment, and the court may have implicitly decided that the father’s attempts to see the child during the time it was in dependent care were, in the words of the section 39.01(1), “only marginal efforts that do not evince a settled purpose to assume all parental duties,” nonetheless a performance agreement would have extensively advised the father of the directives he was required to follow during the child’s dependency and placement in other care. If a performance agreement had been prepared and explained to appellant, the father would have been apprised of the following: the specific reasons that necessitated removal of the child from the home and the remediation of those conditions which would permit the return of the child to its parent, the parents’ specific financial responsibilities and obligations and the visitation rights and obligations of the parent during the time the child is placed in foster care, the date on which the child is expect *1367 ed to be returned to its home, and, finally, if the parent fails to comply with the conditions enumerated in the agreement, notice to him that the father may ultimately be faced with loss of parental rights. Section 409.168(3)(a)6a-h.
I concede that even if the father had been furnished the opportunity of participating in a performance agreement, his attempts to remedy the problems that caused removal of the child from his home may not have been any greater than his desultory attempts to comply with the court’s earlier directives, but, if the legislative intent is to be given any meaningful application, he must be afforded that opportunity. Notwithstanding the parents’ indifferent, half-hearted attempts to comply with prior court orders regarding the welfare of their children, we have steadfastly refused to sanction permanent commitment if the parents were not provided their statutory right to participate in a performance agreement. See In Interest of A.B.; In Interest of C.T.G., 460 So.2d 495 (Fla. 1st DCA 1984).
The Florida Supreme Court itself addressed this problem in its recent opinion in Burk v. Department of Health and Rehabilitative Services, rejecting the argument that a performance agreement need not be entered into by HRS where permanent commitment is sought under subsection 39.41(l)(f)la, because of parental abandonment, abuse or neglect, and stated that the legislature, “My enacting the mandatory language of Section 409.168, ... did not grant HRS the discretion to pick and choose which parents deserve a performance agreement. All parents must be offered one. Whether a parent will comply with the agreement has no bearing on HRS’s statutory duty to prepare it.” Id. at 1278 (e.s.). In requiring the execution of the performance agreement, the court recognized that the statute did not mandate the return of the a child to an abusive home, only that HRS must follow the statutory procedure required before terminating parental rights. Burk also rejected the department’s argument that the placement of the child in an emergency shelter was not foster care, observing that the statutory definition of foster care under Section 409.168(2)(d), Florida Statutes (1983), was broad enough to encompass emergency care facilities. The court so held, notwithstanding that the department’s rules separately define foster care and emergency shelter. For examples, compare the definitions of agency operated shelter, contracted emergency shelter facility and family home shelter, rules 10M-1.02(5), 10M-1.-02(21), 10M-1.02(36), with foster family home and foster family group home, rules 10M-1.02(37) and 10M-1.02(38). I can only conclude from my reading of the Burk decision that the court was well aware of the technical distinctions between foster care and emergency care facilities, but nevertheless decided that from the standpoint of complying with the requirement of the performance agreement procedure, the definition of foster care under section 409.-168(2)(d) necessarily included emergency care.
This court has implicitly arrived at a similar result in T.W.S. There we stated that the lower court had erroneously terminated a defendant child’s placement in foster care under the protection of his paternal grandparents, by simply placing him in the custody of the grandparents, without department supervision, observing that there had been no compliance with the dictates of section 409.168 (no performance agreement was offered to the mother). 406 So.2d at 388. We reversed the order terminating foster care, and directed that HRS resume its supervision over the child. Id. at 389. My understanding of the opinion is that the court did not discountenance the child’s placement in the home of its paternal grandparents as foster care for section 409.168 purposes, but held that the grandparents’ indeterminate custody of the dependent child, after it had been removed from foster care, was contrary to the specific requirements of section 409.168.
Similarly, in the case at bar, to require HRS to comply with its duty to offer the appellant the opportunity to participate in a performance agreement would not mandate *1368 the return of the child to an abusive or neglectful home. The parent may eventually forfeit his parental rights to the child, but he must be given an opportunity to place himself in compliance with the statutory procedure, before any later proceeding terminating his rights is undertaken. A strict adherence to the requirement of offering a performance agreement to a natural parent as a precondition to terminating parental rights in all cases in which a child has been adjudicated dependent by reason of the parent’s abuse, neglect or abandonment, and placed in the care of another person or persons, enforces the recognition “that a parent’s desire for and right to ‘the companionship, care, custody, and management of his or her children’ is an important interest that ‘undeniably warrants deference and, absent a powerful countervailing interest, protection.’ ” Lassiter v. Department of Social Services, 452 U.S. 18, 27, 101 S.Ct. 2153, 2159, 68 L.Ed.2d 640 (1981). (quoting Stanley v. Illinois, 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972)).

. Foster is defined as: "[A]ffording, receiving or sharing nourishment, upbringing or parental care though not related by blood or legal ties: as a: rearing the child or another <a parent > b: brought up by someone other than one’s natural parent <a child > c: reared in the same family but not of the same parentage < brothers >”. Webster's Third New International Dictionary G. & C. Merriam Co. (1971).