ON REHEARING EN BANC
BOOTH, Judge.
This cause is before the court en banc pursuant to Rule 9.331, Florida Rules of Appellate Procedure, the court having determined that the case is one of exceptional importance,[2] affecting the rights of parents and children in this State and the interpretation of Chapter 39, Florida Statutes (Supp.1986), as applied to a noncustodial, biological father[3] and proceedings to terminate parental rights based on abuse and neglect. On consideration of the briefs, supplemental briefs, oral argument, and record, the majority of the court en banc has determined that the order of the trial court severing parental rights of appellant be affirmed.
THE FACTS
On February 10, 1980, “Betty,” age 20 and unwed, gave birth to a son “D.”[4]
Later that same year, she moved to Florida, renewed her acquaintance with appellant, and she and appellant started living together. On October 23, 1981, appellant struck D., 18 months, repeatedly[5] in the face during the course of an altercation with Betty, who was holding the baby. Both appellant and Betty had been drinking, and appellant was, by his own description, “quite intoxicated.” The next day, the landlord happened to come to the house occupied by appellant, Betty, and D. His testimony at the termination hearing was as follows:
I was painting an apartment. I had two duplexes next door and I had some stuff stored in the house by agreement with the young lady and young man and went over there to get a drop cloth and some painting material and I knocked on the door and Betty answered the door and she had — looked like she was injured. She had caked blood all over her face and a black eye and she looked like she had been injured and I asked her if I could help her and she said, no, she’d be all right. And I said, how did this happen and she said John had done this to me. I said, well, I don’t want to interfere with anything that goes on between you and [he] but I need some stuff out of the back room and I need to get it. She said, okay, so she let me in and the little boy came out of the kitchen area and the little boy is — he was injured, he was hurt. He had severe welts around his face and his eyes were bloodshot, not bloodshot — like you would stay up all *658 night but there was blood injury lines in his eyes. The kid was hurt and I said, Betty, what happened to this kid and she said he fell and I said, that kid didn’t fall and I said what happened to the kid, he should go to the hospital and she said the kid fell and I said, well, I’m going to take him to the hospital so I asked — I can’t remember if they had a phone or whether I went next door to the apartments to get a phone but I called my wife and she came over and took the child to the hospital.[6] Betty said John was not home at the time. She said, don’t do this, John will get mad. I said, I don’t care whether he got mad or not and the child went to the hospital and I stayed back at the place.
Appellant took the baby to the emergency room, where he told a story of the child falling down. The emergency room doctor, however, determined that the child’s injuries were inconsistent with a fall. The baby had nine distinct bruised areas on his face, as well as injuries to the left eye and to the tympanic membrane of the left ear. The doctor reported it as a case of aggravated child abuse to Children and Youth Services. Officer Paul Brown arrived at the hospital to investigate. Officer Brown took pictures of the injured child, personally observed the child’s injuries, and contacted appellant and Betty. After being advised of their rights, both gave statements that appellant struck the child in the course of committing a battery on Betty. Officer Brown testified at the termination hearing as to the foregoing facts, as well as to the fact that appellant expressed remorse over the incident and that appellant stated he was like a “daddy” to D.
Appellant was charged with aggravated child abuse but was allowed to plead nolo contendere to child abuse. The court withheld adjudication on the child abuse charge and, after preparation of a presentence investigation report, sentenced appellant on March 26, 1982, to five years’ probation. Appellant was placed on community control. He was ordered out of the residence he had shared with Betty for at least six months, but visited there nonetheless.
Three days after appellant pleaded to the child abuse charge, HRS assigned a protective service worker, Sandy Cesulka, to the family. Beginning February 19, 1982, and for four years and three months thereafter, Ms. Cesulka visited in the home at least once a month.
On March 10, 1983, Betty gave birth to another child, son “J.,” fathered by appellant. The parents voluntarily placed the newborn under Department of Health and Rehabilitative Services (HRS) protective services.
Protective service worker Cesulka testified at the termination hearing that during the time appellant and Betty were together, the fighting and beating up of Betty continued. Cesulka testified to the condition of the various places the couple lived during her supervision, to the holes in the wall, the telephone pulled out of the wall, the window and/or door being broken, and to other evidence of violence. Officer Brown reported he had been called to investigate disturbances involving the couple that were domestic in nature and involved alcohol. There was testimony that appellant “got crazy” when he was drinking. Counsel for appellant frankly stated at oral argument before this court that the relationship between Betty and appellant was a “combative” one.
Ms. Cesulka testified that during her work with the family, cooperation was minimal and that conditions never improved to the point where the case could be closed out. Problems kept occurring, and there were continued complaints of the children not being taken care of, of their being left with neighbors and relatives for long periods of time, and of their not being fed or clothed properly. On one occasion, Ms. Cesulka went to the home at 10:00 a.m. and found the child J., then age two, wandering around, unattended and unfed, draining the *659 dregs from a beer can. Betty was still in bed.
Cesulka testified that “the relationship between the two of them [appellant and Betty] was always detrimental to the children,” and that when appellant was imprisoned for a period of time, that things were better. HRS obtained marriage counseling for the couple. They showed some interest, but then the fighting would resume.
Sometime after the birth of J. in February of 1983, appellant and Betty broke up, and Betty began her involvement with a series of other boyfriends. Appellant was irate and harassed her by driving around the neighborhood squealing the tires of his car. In January of 1985, he broke into the apartment where Betty was with another man and physically assaulted them. An altercation resulted in which appellant was shot in the leg by the other man. Appellant was charged with two counts of battery plus burglary. He pleaded nolo con-tendere to all three counts, and adjudication was withheld. On January 11, 1985, he was sentenced to two years of community control.
After the breakup, appellant also made a number of reports to HRS of the children being left unattended, that the children were being mistreated by Betty’s new boyfriend, and that Betty was giving AFDC (Aid to Families with Dependent Children) money to a boyfriend to buy drugs instead of using it for the children. HRS dutifully investigated the reports, but only the two made on June 18 and 19, 1986, were substantiated. Betty testified she had to go pick up a car and that a friend had promised to babysit. In any event, while investigating appellant’s report, HRS found the children, ages three and five, left alone on June 18. The intake officer at the scene on June 18 turned the children over to appellant. The next morning, appellant called Betty and told her to come and get them, saying nothing to Betty about his report to HRS or about the intake officer having been to her home. The next night, appellant again reported the children left alone, and this time HRS found five-year-old D. alone and took him into protective custody. Later, HRS located J. and took him into custody as well. The agency was then required to, and did, file dependency proceedings under Chapter 39, Florida Statutes.
On June 21, 1986, HRS filed a petition for dependency of both boys, and the children were adjudicated dependent. On that same day, a guardian ad litem was appointed, and the children were placed into foster care. The dependency order allowed appellant to have supervised visitation with J. one day every two weeks for up to two hours, the visitation to begin 30 days after he signed a performance agreement. John signed the performance agreement, the first of two he was offered, on June 21, 1986, the same day the order of dependency was entered.
Appellant did not complete the first performance agreement and was offered another chance in November of 1986. At the time he signed the second agreement, he was in jail awaiting sentencing for yet another criminal offense. On April 2, 1987, he pleaded nolo contendere to possession of over 20 grams of marijuana and violation of community control, and was sentenced to 30 months in prison. He ultimately served 11 months of that sentence, with time off for work days and gain time.
THE TRIAL COURT’S ORDER
The trial court heard the testimony of 16 witnesses over a four-day period and entered an order severing the parental rights of both parents. That order is, in pertinent part, as follows:
The Petition [for Termination of Parental Rights] sets at issue concerning the father ..., concerning his son, [J.], physical abuse toward the half-brother of [J.], [D.], for which the father was convicted and placed on probation, and inability to change his behavior toward [D.], or his own child, and neglect toward his child, and his failure to comply with two performance agreements, one of which was extended, even though able to do so....
[[Image here]]
*660 Both children were adjudicated dependent by this Court on July 21, 1986, and ordered into foster care....
[[Image here]]
Both children are now and have been since before July 21, 1986, living in the State of Florida in Okaloosa County and under jurisdiction of this Court and no other guardian has been appointed to care for these children other than by order of this Court.
[[Image here]]
On October 23, 1981, [the father], in a physical altercation with [the mother], hit [D., his stepson], severely bruising his face in nine places.
Neither [the mother] nor [the father] took [D.] to the hospital for needed medical treatment until approached by their landlord ... that it was necessary to do so on the evening of October 24, 1981....
[The father] would regularly, about weekly, physically abuse [the mother] during the period of time that they were living together....
[The father] has a history of violence with a criminal conviction for child abuse, burglary, drug offenses, and an inability to comply with probation and community control standards....
[[Image here]]
... [J., appellant's son], in July of 1986, when taken into foster care, was socially very far behind children of his own age group of 3-V2 years. He is still behind his age group but is improving. At first he would whimper all of the time and he was not able to go to the bathroom without someone assisting him. He would sit and stare in space. At first he would have to be fed 80 percent of the time, but now has improved to where he will eat himself most of the time and only requires feeding by others 5 percent of the time. He has reduced the soiling of his pants and is now sleeping at night....
[The father], although able to do so, has not substantially complied with either performance agreement presented to him and agreed to by him....
[[Image here]]
... [The father] did not get an alcohol and drug evaluation nor a psychological evaluation as required by the performance agreement due to the reasons presented by him that he was either unable to afford to do so; even though he never sought to do so at the expense of the Department of Health and Rehabilitative Services, and that he was too busy to have it done....
Neither [the father] nor [the mother] will ever be able to give these children a stable permanent home necessary for these children to become productive adults....
[The father] was arrested as a juvenile for possession of marijuana and placed on 3 months probation. After that he began a long history of driving while intoxicated, driving while his license was suspended and disorderly intoxication between January, 1979, up to November, 1986....
[[Image here]]
... [C]learly and convincingly, the children have been abused and neglected by both ... the father of [J.], and ... the mother of both children.
The abuse and neglect of the children at the hands of both parents has occurred over a long period of time and is ingrained, with no reasonable likelihood of change. The abuse and neglect suffered by these children has occurred over a long and extended period of time and the only way to prevent this abuse and neglect from occurring again, is to terminate the parental rights between the parents and the children.
The court finds by clear and convincing evidence that it is in the manifest best interests of the children, [D.] and [J.], that they be permanently committed to the Department of Health and Rehabilitative Services for subsequent adoption.
ISSUES ON APPEAL
Appellant contends that the evidence is insufficient to meet the clear and convincing burden of proof required to sever pa *661 rental rights and that the court improperly considered the child abuse offense involving the other child and held him responsible for the neglect of J. while the child was in the custody of the mother. Appellant also contends that the trial court improperly relied on his failure to perform the performance agreements as the sole basis for termination and erred in not finding that appellant had substantially performed, or that performance was excused, either because of his lack of funds or due to his incarceration (see Appendix "A” to this opinion for statement of issues from appellant’s brief).
The original panel opinion in the case reversed the trial court with the following opinion:
This is an appeal from an order terminating appellant’s parental rights towards his son, J.S.G. Before permanently severing parental rights, the state must prove by clear and convincing evidence that the parent either abused, neglected, or abandoned his or her child. Santosky v. Kramer, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982).[7] Sections 39.464 and 39.467, Florida Statutes (1987).[8] Our review of the record on appeal reveals that the evidence is legally insufficient to terminate appellant’s parental rights by reason of abuse, neglect, or abandonment.
REVERSED.
Thereafter, a motion for rehearing was filed, and within the time for consideration of that motion, the court determined to consider the case en banc. By order of the court, the parties were notified of en banc consideration and directed to file supplemental briefs addressing: (1) Adoption of Doe: Doe v. Roe, 543 So.2d 741 (Fla.1989), and Lehr v. Robertson, 463 U.S. 248, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983), as those cases may pertain to this case;[9] (2) the burden of proof and standard of appellate review; and (3) sufficiency of the evidence in proceedings terminating parental rights. Thereafter, each party was allowed to file a responsive brief to the brief of the opponent, and oral argument was held.
BURDEN OF PROOF AND STANDARD OF REVIEW
The statutory and case law of this state requires that the allegations of the petition to sever parental rights be proved by clear and convincing evidence,[10] but there is little definition of those terms. There is no case law defining the standard to be applied in the appellate court in reviewing termination proceedings under Chapter 39, Florida Statutes.
The Florida Supreme Court has held that “clear and convincing” is something more than a simple preponderance and less than the standard applied in criminal cases, and that it is evidence free of substantial doubts or inconsistencies. The Florida Bar v. Rayman, 238 So.2d 594, 596 (Fla.1970). McCormick, in his work on evidence,[11] states that the imposition of a higher standard of proof in certain situations “seems to have had its origins in the standards prescribed for themselves by the *662 chancellors in determining questions of fact in equity cases.” McCormick states that on appeal under classical equity practice, the cause was tried de novo, reapplying the clear and convincing standard, but that the modern rule is to the contrary. Thus:[12]
The appellate court, under the classical equity practice, tried the facts de novo, upon the deposition testimony in the record, and thus it was called on to apply anew the standard of clear and convincing proof in its study of the evidence. But in the modern system there are usually restrictions upon appellate review of a judge’s findings of fact, even in equity issues. Thus, in the federal courts under Rule 52(a) his findings will only be reversed when “clearly erroneous.”
And in jury-tried cases the verdict will be reviewed only to the extent of determining whether there was evidence from which reasonable men could have found the verdict.
We hold that a trial court’s determination that evidence is clear and convincing will not be overturned unless it may be said as a matter of law that no one could reasonably find such evidence to be clear and convincing.[13] The Florida Supreme Court in The Florida Bar v. Hooper, 509 So.2d 289, 290-291 (Fla.1987), ruled that where “clear and convincing” evidence is required, the findings of the lower tribunal should not be overturned on appeal “unless clearly erroneous or lacking in evidentiary support,” holding:
Respondent contends that the referee’s findings of misconduct are not supported by legally sufficient evidence. He asserts that the findings do not meet the standard of proof “by clear and convincing evidence.” In a referee trial of a prosecution for professional misconduct, the Bar has the burden of proving its accusations by clear and convincing evidence. [citations omitted]. However, this Court’s review of a referee’s findings of fact is not in the nature of a trial de novo in which the Court must be satisfied that the evidence is clear and convincing. The responsibility for finding facts and resolving conflicts in the evidence is placed with the referee, [citation omitted]. The referee’s findings “should not be overturned unless clearly erroneous or lacking in evidentiary support.”
We have reviewed the trial court’s order in the light of these basic principles and in accord with the presumption of correctness of the trial court’s order. Our review of the record is not a de novo review or rede-termination of the facts and issues. Even were we so inclined, we find no authorization for that procedure. Our review is addressed to the issues made on appeal and to the evidentiary support for, and correctness under the law of, the trial court’s order on those issues. We hold that the trial court’s determination that the evidence is clear and convincing is supported by the record and cannot be held to be unreasonable as a matter of law.
CHILD ABUSE
Section 39.01(2), Florida Statutes,[14] defines child abuse as “any willful act that results in any physical, mental or sexual injury that causes or is likely to cause the child’s physical, mental, or emotional health to be significantly impaired.”
The facts supporting the trial court’s termination of parental rights include appellant’s physical abuse of D., his physical abuse of Betty, his history of violence associated with alcohol abuse, his rejection of alcohol rehabilitation and counseling services offered, and the condition of J. when taken into foster care.
Appellant contends that the criminal offense of child abuse he committed in 1982 against D. should not be considered as evidence of child abuse of J., because D. is *663 ■not his own child, the offense was remote in time, occurred prior to the birth of his own child, and was an accident occurring when he was drunk, it was dark, and he was intending to hit the mother and not the child. The trial court obviously considered appellant’s explanations offered in mitigation to be of little merit. We agree.
The trial court was not required to disregard the child abuse of D. for any of the reasons stated by appellant. Nor was the trial court required to believe that the beating, resulting in nine separate bruises to the child’s face, was “accidental.” [15] Appellant had lived with the baby D. and his mother in a family relationship for more than a year at the time of the offense, and testified he considered himself D.’s father. Therefore, appellant’s abuse of the infant D. can be considered as bearing on appellant’s conduct with regard to J., his biological child.
In the case of In the Interest of W.D.N., 443 So.2d 493 (Fla. 2d DCA 1984), the court held that the mother’s abuse of two of her four children was properly considered as a basis for permanent commitment of the other two children against whom no acts of abuse had been reported, holding:
To continue to expose children to abuse by a parent simply because findings of prior abuse by the parent only concerned others of the parent’s children would constitute an unacceptable risk to the children where, as here, the mother’s propensities in that regard were shown to be beyond reasonable hope of modification. The trial court specifically found that each of the three children who were permanently committed in the proceedings now on appeal “is, or potentially is, an abused child.” As stated above, prior findings of child abuse concerned C.N., the male, and another child, S.N., who had previously been permanently committed.
In Spankie v. Department of Health and Rehabilitative Services, 505 So.2d 1357 (Fla. 5th DCA 1987), review denied, 513 So.2d 1063 (Fla.1987), Padgett v. Department of Health and Rehabilitative Services, 543 So.2d 1317 (Fla. 5th DCA 1989), and In the Interest of J.L.P., 416 So.2d 1250 (Fla. 4th DCA 1982), the courts held that abuse may be established prospectively based on clear and convincing evidence that the child is or will be abused. The last two cases also hold that sibling abuse can be considered evidence of prospective abuse supporting termination of parental rights. In the related area of custody under Chapter 61, Florida Statutes, sibling and spouse abuse are relevant. Carr v. Phillips, 540 So.2d 168 (Fla. 4th DCA 1989), holds sibling abuse was relevant in custody battle between parents; Section 61.13(2)(b)2, Florida Statutes, provides in part as follows:
The court shall consider evidence of spouse abuse as evidence of detriment to the child.... If the court finds that spouse abuse has occurred between the parties, it may award sole parental responsibility to the abused spouse and make such arrangements for visitation as will best protect the child and abused spouse from further harm.
Appellant’s contention that his conduct occurring prior to the birth of J. cannot be considered is without merit. In the recent decision of Adoption of Doe: Doe v. Roe, 543 So.2d 741, 745-746 (Fla.1989), the Florida Supreme Court held that the biological father’s prebirth conduct in failing to assume responsibilities for the mother of his unborn child was relevant to issue of abandonment, holding:
The root issue then is whether prebirth conduct is relevant to the issue of aban *664 donment under chapter 63. In Florida, evidence is relevant if it tends to prove or disprove a material fact and, unless prohibited by law, all relevant evidence is admissible. §§ 90.401, .402, Fla.Stat. (1985). We conclude that prebirth conduct does tend to prove or disprove material facts bearing on abandonment and may be properly introduced and used as a basis for finding abandonment under the statute, [emphasis in original]
In the instant case, appellant’s conduct pri- or to the birth of J. with respect to the relationship of which he was born, is relevant to the issue of neglect and abuse of J.
The trial court was entitled to consider appellant’s commission of child abuse against D., together with all the attendant circumstances. These circumstances included the claimed accidental nature of the beating, the story told by appellant that the child fell from appellant’s shoulders, the delay in seeking medical attention for the child until the landlord intervened, the testimony that appellant would be mad if medical care was sought for the child, and the fact that Betty’s obvious injuries received due to the beating administered by appellant were the reasons appellant, rather than Betty, took the child to the hospital.
The battering of baby D. is not an isolated act as appellant contends. On the contrary, the record establishes appellant’s proclivity for violence. The witness Cesul-ka testified that the beating, fighting, and “slapping around” of Betty continued regularly and throughout the three years the couple was together. The child J. was subjected to the violent, abusive environment and was at risk of being the victim, as his brother had been, of a beating intended for his mother. The law does not require that the child continue at risk until the fortuitous entry of the landlord or neighbor reveals his injury. J.’s condition at the time he was taken into foster care, followed by marked improvement after being in foster care, evidences the damage to the child resulting from the conditions under which he had been required to live.
In J.M. v. Department of Health and Rehabilitative Services, 479 So.2d 826 (Fla. 2d DCA 1985), a three-year-old child sustained some bruising (the parents contended accidentally), without permanent physical injury. The court in that case found, however, that the child suffered mental injury and held that “[u]nder the evidence the trial court was entitled to find that the child became extremely withdrawn and behaved like a recluse.” Id. at 827. Rejecting the parents’ contention that they be given another chance with the child, the court agreed with the trial court’s response to the question posed by HRS in that case, “How much more should this child be forced to endure?" Id. at 828 (emphasis added). That question and response, “No more,” fits here as well. Id. Appellant has had time and opportunities to show that the child abuse offense was an isolated incident out of character for him. Instead he has proved by his own conduct that violence and substance abuse are his way of life by continuing domestic violence, violation of community control, and commission of criminal offenses. He failed and refused to attend the classes or participate in the services offered to help him deal with his problems. The bottom line was that he was not willing to modify his behavior so that a court could reasonably find that the child would not be “at risk” with him.
CHILD NEGLECT
Section 39.01(30), Florida Statutes (Supp.1986), provides:
“Neglect” occurs when the parent or legal custodian of a child or, in the absence of a parent or legal custodian, the person primarily responsible for the child’s welfare deprives a child of, or allows a child to be deprived of, necessary food, clothing, shelter, or medical treatment or permits a child to live in an environment when such deprivation or environment causes the child’s physical, mental, or emotional health to be significantly impaired or to be in danger of being significantly impaired. The foregoing circumstances shall not be considered neglect if caused primarily by financial inability unless services for re *665 lief have been offered and rejected, [emphasis added]
The underscored language of the statute plainly applies to persons such as appellant who allow or permit their child to be deprived of essentials of life such as food, or permit the child to live in an environment where the child’s physical or mental health is, or is in danger of being, significantly impaired. The facts in this case support the trial court’s determination of neglect. The record establishes that appellant failed to meet his obligation of support for J. In 1986-87, when the performance agreements were outstanding, he paid only $199 in child support. The trial court had the opportunity to consider his excuses for nonsupport, including the allegation that Betty was receiving welfare payments for the child and was using the money to give to her boyfriend to buy illegal drugs. Appellant’s testimony on his financial and employment status was contradictory at best. The trial court, as finder of fact, was in the best position to determine the truth of the matter.
The record is replete with testimony of the long-standing neglect of J. and his brother D. The children were repeatedly left unattended and were found unfed, ill-clothed, and having head lice. Perhaps the most telling evidence was the testimony of the foster mother and of the preschool teacher about J.’s condition when he was taken into foster care. The three-and-a-half-year-old child whimpered, stared into space, was unable to feed himself, and was unable to use the bathroom by himself. The foster mother testified, in part, as follows:
[J.] didn’t seem to have the emotional stability to play with children his own age, he was fretful, upset extremely easy, very small in stature, his weight seemed to be that it was a little bit under weight. He was not a happy little boy, fearful of the other children, fearful of adults, he was distrustful, eating was a problem for him, didn’t seem to care whether he would eat or didn’t eat, would forget little things such as even going to the bathroom, going from sitting at the table crying and I’d ask him what was wrong with him and he’d say, I have to go potty. I’d say, [J.], go on into the bathroom and go. A couple of minutes later, [J.] wouldn’t have returned to the table, so I went to check on him and he was standing in the middle of the bedroom just kind of whining and I’d ask him what’s wrong [J.]. I forgot what I’m to do. A child of three and a half, I have not had that same experience with before. This was not a one time thing. It was something that was repeated time and time again with [J.]. The other children found him very difficult to play with. He wanted to relate more with the very younger children, being the one year old rather than the three year old or the three and a half year olds.
[[Image here]]
The first year, I have tried to feed [J.] 75 to 80 percent of all food that went in his mouth. He would maybe eat the other 20 percent, maybe he wouldn’t. In the last four or five months, [J.] is feeding himself, I would say, 80 percent of the food and he is — I will help him finish up the rest whatever the food is left. He’s gained five pounds since I’ve had him and he’s grown probably five inches and that I can’t say exactly how tall but I do know he’s gained five pounds.
The preschool teacher testified that J. was “withdrawn” and “aggressive” and that when he first came into her class in September of 1987, he “was throwing chairs, aggressive to other children,” and would throw a chair at her or the teacher’s aide in anger if they tried to correct him. His behavior was improving up until March, when he had a birthday visit with his parents. After his return to school, his behavior deteriorated to what it had been in September, and his parents were asked to remove him from school.
The preschool teacher also baby-sat with J. On one occasion when he had a cold, he spit out his medicine, and she told him he would have to help her clean it up. When she turned around again, J. was on the floor licking up the medicine. She was horrified when he told her that this was the *666 way his mommy and daddy taught him to clean up his messes.
Appellant contends that since he has never had legal or actual custody of J., he cannot be held responsible for anything that has occurred while the child was in the care of the mother. This contention demonstrates appellant’s lack of understanding of parental responsibility. The law imposes an equal duty on each parent for the protection, maintenance, and care of the child, as is well stated 59 American Jurisprudence 2d Parent and Child Section 13:
It is the right and duty of parents under the law of nature as well as the common law and the statutes of many states to protect their children, to care for them in sickness and in health, and to do whatever may be necessary for their care, maintenance, and preservation. The child has the right to call upon the parent for the discharge of this duty, and public policy will not permit or allow the parent to divest himself irrevocably of his obligations in this regard or to abandon them at his mere will or pleasure. An omission to discharge this duty is a public wrong which the state, under its police powers, may prevent. Each parent has an equal duty to support and protect the child and cannot stand passively by and refuse to do so when it is reasonably within his power. The duty of care is not necessarily dependent on custody; thus, a mother who does not have custody of her child may have a duty to give him some personal care and attention, though the child is being properly supported and maintained by the father. Parents are not required to do the impossible in caring for their children, but are bound to provide such reasonable care and protection as an ordinarily prudent person, solicitous for the welfare of a child, would deem necessary. [emphasis added]
In Yem v. State, Department of Health and Rehabilitative Services, 462 So.2d 1147 (Fla. 3d DCA 1984), the court held it was not necessary that a parent have actual custody in order to neglect a child, stating:
Additionally, we note that the fact that the mother never had actual custody of her child does not foreclose a finding of neglect. See In re J.L.P., 416 So.2d 1250 (Fla. 4th DCA 1982). We do not hold that long-term incarceration for conviction of a crime in and of itself works an automatic forfeiture of parental rights. An imprisoned parent, however, is not relieved of all parental responsibilities because of imprisonment. It is apparent from the record in the present case that the mother had relatives living in the area, other than the child’s grandfather. There is no evidence, however, indicating she ever attempted to have these relatives undertake the care of the child or provide a decent environment for the child to live in. Thus, she has neglected her child by permitting the child to live in an environment condemned by the Florida Juvenile Justice Act. See § 39.01(26) and § 39.41(l)(f)l.a. [sic]
In In the Interest of Baby Boy A, 544 So.2d 1136, 1137 (Fla. 4th DCA 1989), the facts were that the biological father was incarcerated since three days after birth of his child and had abused an older sibling. The mother surrendered the child for adoption. The court upheld termination of the father’s parental rights, holding:
We recognize that a trial court need not wait until the prospective abuse or neglect occurs before severing the parental ties because the best interest of the child overrides parental rights. In the Interest of J.L.P., 416 So.2d 1250 (Fla. 4th DCA 1982).
In Warren v. Department of Health and Rehabilitative Services, 501 So.2d 706, 708 (Fla. 2d DCA 1987), review denied, 508 So.2d 16 (Fla.1987), the court held:
At the final hearing, clear and convincing evidence was produced to establish that the natural mother did not effectively parent her children and did not exhibit the capacity or desire to do so. Evidence was produced that placement with the natural mother or continued placement with the child’s grandmother would result in emotional and mental neglect and injury to the child. The court found that *667 since appellant did not want to be the child's custodian, she would continue to neglect the child.
The court in In the Interest of J.L.P., 416 So.2d 1250, 1252 (Fla. 4th DCA 1982), held:
Appellant contends neglect cannot be prospective, and because she never had custody of the child, she could not have legally neglected him. We disagree. We also think abuse under section 39.-01(2), Florida Statutes (Supp.1980), may be established prospectively.
Appellant claims to have demonstrated his concern about the children by making reports to HRS about the children being left unattended or mistreated. Appellant’s conduct in this regard is ambiguous. Two reports of the child left unattended were substantiated. Others were not substantiated or were withdrawn when the couple “made up.” The testimony was that appellant would make the reports and then nullify them if Betty would take him back:
Q [appellant’s counsel] ... Mr. Johnson was asking about [appellant’s] cooperation with you, you made a comment at that time, he becomes sometimes irate and makes complaints about the care of the children, wouldn’t you view this as his concern for their welfare?
A [Cesulka] I would at one point and then he’d turn around later, a couple of weeks later when he’d be back with Betty and really say they were inaccurate and he would nullify them. As soon as he got Betty back, the complaints would stop and it wouldn’t be substantiated. If you understand what I’m saying, it seemed to be contingent upon his getting back with Betty.
The trial court was in the best position to determine whether appellant’s concern for the child was genuine, substantial, and motivated his making reports to HRS.
PERFORMANCE AGREEMENTS
Section 409.168(2)(g), Florida Statutes (Supp.1986), defines performance agreement as a document ordered by the court, prepared by the social service agency responsible for the foster home placement in conference with the natural parents, and signed by the parent(s), the social service agency, the foster parent, the guardian ad litem for the court, if one has been appointed, and by the child, if appropriate. The purpose of the agreement is to record the actions of the parties involved in order to quickly assure the safe return of the child to this parent or, if not possible, to a permanent adoptive home. § 409.168(3)(a), Fla.Stat. (Supp.1986). Substantive compliance with the agreement is defined in Section 409.168(2)(j), Florida Statutes, as:
“Substantial compliance” means that the circumstances which caused the placement in foster care have been remedied to the extent that the well-being and safety of the child will not be endangered upon the child’s being returned to the child’s parent or guardian.
In the Interest L.R.O. v. State, 471 So.2d 111, 113 (Fla. 1st DCA 1985), states the purpose of performance agreements as follows:
The statute [§ 409.168] is plainly intended to insure clear and definite progress toward a permanent resolution of the child’s dependency. A performance agreement was mandated in In the Interest of C. T. G., 460 So.2d 495 (Fla. 1st DCA 1984), as the statutory mechanism for HRS to identify to the parent the problems or unsatisfactory conditions in the home, and to assist the parent to remedy those conditions. The performance agreement is therefore a means to provide notice to the parent of the specific conditions which must be met for termination of foster care, and notice that failure of compliance may serve as the predicate for permanent commitment. *668 or conditions” are by law parental abandonment, abuse or neglect, those problems or conditions are to be reviewed retrospectively, presently and prospectively by the court, in compliance with the time constraints of section 409.168.
*667 This court further stated in In the Interest of A.B., 444 So.2d 981, 994-995 (Fla. 1st DCA 1983):
The performance agreement will specify among other things “the problems or conditions in the home of the parent or parents which necessitated removal of the child from his home and the remediation of which determines the return of the child to the parent or parents.” § 409.168(3)(a)6a. Since those “problems
*668 [[Image here]]
If the parent has not substantially complied with the performance agreement as from time to time modified and extended within the limits prescribed by section 409.168(3)(c), and so has not alleviated the child’s dependency past or in prospect, then, it being “manifestly in the best interests of the child to do so,” § 39.41(l)(f)l, the court is to permanently commit the child for adoption.
Failure to comply with a performance agreement cannot be the sole basis for termination of parental rights, In the Interest of P.A.D., 498 So.2d 1342 (Fla. 1st DCA 1986); however, it is one of the factors the court considers in determining if a child can be safely taken from foster care and returned to his natural parent(s) or prior home. In In the Interest of J.L.C., 501 So.2d 92, 93 (Fla. 1st DCA 1987), this court stated:
We likewise conclude that the termination order was based on clear and convincing evidence of neglect adduced at the hearing, and not simply the mother’s failure to satisfactorily meet the terms of her performance agreement. Therefore, the ruling is consistent with the recent decision of the supreme court in In re R. W, 495 So.2d 133 (Fla.1986), and this court in In re P.A.D., 498 So.2d 1342 (Fla. 1st DCA 1986). Those decisions, while holding unconstitutional the statutory provision in section 39.41, Florida Statutes (1985), authorizing termination of parental rights solely for failure to substantially comply with the terms of a performance agreement, do not preclude the trial court from receiving and considering evidence of such failure in conjunction with evidence of neglect.
In the instant case, the trial court in its order of dependency of July 21, 1986, required HRS to offer appellant a performance agreement and the agency complied. Appellant was thereby afforded the opportunity to establish that he would be a fit parent, despite the fact that he had never had legal or actual custody of the child. Appellant signed the first agreement on July 21, 1986, and the second on November 18, 1986.
Both performance agreements had the same provisions.[16] The first portion of the agreement dealt with testing and treatment for substance abuse. The first provision required appellant to sign a consent form to allow HRS counselors to obtain the results of substance abuse and treatment as recommended by the evaluation, and the balance of the first page of the agreement dealt with drug and alcohol testing, evaluation, and treatment. The second page of the agreement required that appellant attend and participate in 90 percent of scheduled parenting classes and provide an attendance record. Page three of the performance agreement concerned employment and required appellant to discuss his interests and abilities, to follow through on all referrals, and to furnish proof of employment. The agreement required that he work out a household budget and obtain and maintain a job or income earning at least the minimum wage. He was required to furnish both proof of employment or other means of support and proof of child support on a regular basis. The next requirement was that he provide suitable *669 shelter and provide documentation of rent or purchase payments and utility payments, and maintain one week’s food supply. The last section of the agreement dealt with appellant’s undertaking to undergo a psychological evaluation at his own expense and required him to participate in individual and/or family therapy, as recommended by the evaluator. The final requirement of the agreement was that he sign a consent form to allow the results of the evaluation and the therapy to be available.
Appellant did not perform either agreement despite the urging of the HRS foster care counselor and the guardian ad litem, both of whom testified to their conversations with appellant urging him to do something on the agreements.
When appellant took the stand, he did not contradict these witnesses’ testimony as to their efforts and their conversations with him on the performance agreements. Appellant first stated that he did not have the money to pay for the substance abuse testing and the psychological evaluation. Then he stated, as to the abuse testing, that he thought his testing in connection with his probation satisfied the requirement. His first test came out positive for drugs. Appellant stated: “The first one came out positive. I knew it would. I didn’t deny that it would and I sustained [sic] from there [on] and the second one came out negative.” Appellant took no further tests for drugs.
For a brief period in 1981, appellant took antibuse treatments at the alcohol center. There is evidence that appellant is an alcoholic who definitely needs treatment if he is to avoid committing the same type of offense (child abuse) again. However, after one month of treatment, appellant advised that he did not want to follow the prescribed program and would follow his own program. He never returned to the alcohol center.
As to the psychological evaluation, appellant testified that he had the money but did not have time. He did not attend any of the parenting classes because he understood that Betty would be there with her new boyfriend. He lived in his mother’s house for more than 14 years but had no proof of paying her any rent or making other financial contribution, so the aspect of the agreement dealing with maintaining a home was unsatisfied. When he was in prison during the time of the second performance agreement, he claimed that the alcohol and drug treatment programs provided in the prison were not available because he was not going to be there long enough. His total proof of employment during the time of both agreements consisted of two check stubs that his mother handed in for him. Support for his child consisted of one payment of $199 in 1986 and none for 1987.[17] He was $2,599 in arrears. Appellant testified that he is an experienced carpenter who builds houses and cabinets, and has worked for a number of companies, sometimes doing two jobs to make more money.
TERMINATION OF PARENTAL RIGHTS
Section 39.41(l)(f)3, Florida Statutes (Supp.1986), provides that when any child is adjudicated dependent, the court having jurisdiction of the child shall have the power to permanently commit the child to HRS ^ for subsequent adoption if the court finds that it is manifestly in the best interests of the child to do so and if the court further finds, based on clear and convincing evidence, that the parent(s) has abused or neglected the child. There is evidence in this case that HRS has located a family that wants to adopt both D. and J., who are now 9 and 6 years old, respectively. The boys have always been together, even in foster care.
Appellant is a biological parent who, by his own assertion, has never had legal or actual custody of the child. Indeed, he has at no time sought custody of the child. In these proceedings, he seeks to retain his parental rights by having the child J. remain in the limbo-land of foster care. In *670 this way, he can continue to visit the child. There is no prospect offered as to when, if ever, appellant would be able and willing to either assume parental responsibilities or to relinquish parental rights so that the child can at last have a permanent home.
Section 409.168(l)(a), Florida Statutes (Supp.1986), provides in part:
It is the intent of the Legislature that each child be assured the care, guidance, and control in a permanent home which will serve the best interests of the child’s moral, emotional, mental, and physical welfare and that such home preferably be the child’s own home or, if that is not possible, an adoptive home.... It is the intent of the Legislature that permanent placement with the biological or adoptive family be achieved as soon as possible for every child in foster care and that no child remain in foster care longer than 1 year.... When two or more children in foster care are siblings, every reasonable attempt shall be made to place them in the same foster home; and, in the event of permanent commitment of the siblings, to place them in the same adoptive home.
CONCLUSION
It is a matter of human knowledge that every day in the life of a small child is important to his physical, mental, and emotional development. The Legislature has expressly recognized the need for prompt disposition of matters involving children in foster care and made clear its intent that in matters of permanent placement, “the best interests of the child’s moral, emotional, mental, and physical welfare” is of paramount concern. The order of the trial court comports with this expression of public policy, is supported by the record, and is not unreasonable as a matter of law. For the foregoing reasons, the judgment of the trial court terminating parental rights of appellant as to the child J. is affirmed.
SMITH, JOANOS, WENTWORTH, THOMPSON, NIMMONS and MINER, JJ., concur.
ALLEN, J., specially concurs with written opinion.
ZEHMER, J., dissents with written opinion, in which SHIVERS, C.J., and ERVIN, WIGGINTON and BARFIELD, JJ., concur.
BARFIELD, J., dissents with written opinion, in which ZEHMER, J., concurs.
ALLEN, J., did not participate in the en banc oral argument but has been provided with a transcript thereof.
APPENDIX “A”
Appellant’s statement of these issues in his brief is as follows:
Whether or not the State has met its burden under the clear and convincing standard to permanently sever the parental rights of a father towards his son without establishing either abuse or neglect, thereby relying solely on the failure of that parent to substantially comply with other statutory guidelines. Point I. Whether or not the State can rely solely upon a parent’s criminal conviction of child abuse, remote in time and concerning a child of no blood relation to the parent, to permanently sever the father’s parental rights.
In addition, whether or not a noncustodial parent who has demonstrated a persistent pattern of parental responsibility towards his son, can be guilty of neglect while that child is in the mother’s custody, for the purpose of severing his parental rights towards his child.
Point II. Whether or not the alleged failure of the father to comply with two performance agreements with the Florida Department of Health and Rehabilitative Services can provide the sole basis upon which to terminate his parental rights toward his son.
Whether or not when attempting to terminate parental rights relating to children, pursuant to the United States Supreme Court’s clear and convincing evidence standard, the State of Florida has met its burden to permanently commit *671 the children in order to place them for adoption.

.The federal cases interpreting the “exceptional importance" basis for en banc consideration under Rule 35, Federal Rules of Appellate Procedure, suggest two general types of cases that the federal courts have found worthy of en banc review: (1) cases that may affect large numbers of persons, and (2) cases that interpret fundamental legal or constitutional rights. 24 Idaho L.Rev. 255, 265 (1987-1988).
In the related area of cases involving “questions of great public importance,” Article V, Section 3(b)(4), Florida Constitution, the following have recently been certified to the Florida Supreme Court: Adoption of Doe: Doe v. Roe, 543 So.2d 741 (Fla.1989) (prebirth conduct of biological father as related to abandonment), question answered, 543 So.2d 741 (Fla.1989); and Padgett v. Department of Health and Rehabilitative Services, 543 So.2d 1317 (Fla. 5th DCA 1989) (prospective abuse, neglect, and abandonment).

. The biological mother, Betty, has not appealed the order terminating her parental rights.

. The biological father of D., the older half-brother of J., is deceased.

. Appellant’s story is that he hit the child one time and the next day saw a palm print on his face. However, the 26 photographs in evidence show the battered face of the 18-month-old baby. There are bruises and lacerations from into the hair line and forehead to the chin, and bloodied right and left eyes. The photographs do not show all the injuries, which include hemorrhage to the tympanic membrane of the left ear. The trial judge's order states the child’s face was severely bruised in nine places. The number and location of the injuries belies the "one-slap” story.

6. Other testimony established that it was appellant, not the landlord’s wife, who ultimately took the child to the hospital.

7. Santosky v. Kramer, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982), holds that burden of proof in termination proceedings is "clear and convincing” evidence.

8. These proceedings were commenced, and the order of dependency was entered, prior to the amendments to Chapter 87-289, Laws of Florida (1987), which became effective October 1, 1987. The termination hearing was held in December 1987, after that effective date. The parties have not made an issue of whether the 1986 or 1987 version of the statutes controls, and have not suggested to the court that any of the amendments are material to this case. Without discussion of the point, counsel has cited generally to the 1987 version. In view of the substantive rights potentially involved here, we refer in this opinion to the 1986 version, expressly without determining the applicability of amendments not argued or briefed.

. The case was tried below in all respects in recognition of appellant’s parental rights, and no issue was made below or in this court as to the existence vel non of parental rights under Lehr v. Robertson, 463 U.S. 248, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983), and Adoption of Doe: Doe v. Roe, 543 So.2d 741 (Fla.1989).

. Section 39.41(l)(f)3, Fla.Stat.; In the Interest of C.M.H., 413 So.2d 418 (Fla. 1st DCA 1982).

. McCormick, Evidence § 340 at 961 (3d ed. 1984).

. Ibid.

. 5A C.J.S. Appeal and Error § 1656(9), at 519.

. The present definitions of abuse and neglect found in Section 39.01(2) and (3), respectively, are today as they were at the time the proceedings below were commenced.

. Appellant testified he was intending to hit the mother and was "slapping her around" when the baby she was holding was hit. The law presumes a person intends the natural consequences of his acts, and the doctrine of transferred intent is well known. Valassakis v. State, 187 So.2d 74, 77 (Fla. 1st DCA 1966):
When an intent exists to do wrong, and an unintended illegal act ensues as a natural and probable consequence, or if in committing the act an unintended victim is struck down, the original intent as a matter of law is transferred from the one against whom it was entertained to the person who actually suffered the consequences of the unlawful act.

. At oral argument, appellant's counsel responded to questions from the bench concerning the absence of the performance agreements themselves from the record on appeal by stating (1) that the completeness of the record was not an issue on appeal; (2) that the performance agreements were before the judge in the form of testimony and that the agreements were used in direct and cross-examination of the witnesses, including the case workers and parents; and (3) that he had argued against the performance agreements themselves being admitted into evidence since they contained hearsay. We note that both the dependency and the termination proceedings were filed in a single case, so all the records were available to the trial court and to the parties to include or not in the record on appeal. Compare In the Interest of A.D.J., 466 So.2d 1156 (Fla. 1st DCA 1985). At no time has appellant sought to supplement the record in this court.

. Prior to the dependency order and performance agreements, his record of support was five payments in 1983, five payments in 1984, and two payments in 1985.